SIMON STEARNES v. THE STATE.

A game is a trial of skill, or of chance, or of skill and chance, between two or more contending parties, according to some rule by which each one may succeed or fail in the trial ; of skill, as Chess and Billiards ; of chance, as Raffle and simple Lottery ; of chance and skill combined, as Back-Gammon, Whist, Faro, &c.

Betting upon a game is the mutual agreement and tender of a gift of something valuable, which is to belong to the one or the other of the contending parties according to the result.

The rules of the game constitute the terms of the agreement and define the contingency upon which one or the other is to receive the gift.

The staking of the money or property, besides being a tender, is an ostensible adoption or sanction of the agreement.

The games prohibited by our Statute are divided into two classes : 1. Playing at cards in particular places. 2. Gaming tables and banks everywhere.

What facts constitute the keeping or exhibiting a gaming table or bank is matter of law to be expounded by the Judge ; whether the facts exist or not, is matter of fact to be found by the jury.

The characteristic principle or element of the gaming tables or banks specified in the Code, is that they have a keeper, dealer or exhibiter and operator on the basis of one against the many ; the dealer, keeper or exhibiter against the betters, directly or indirectly ; directly, as in Faro, Vingt-un, &c. ; indirectly, as in Pool and Keno.

The leading elements of a gaming table or bank, as deduced by analogy from the specified games, are : 1. It is a game according to the general definition. 2. It has a keeper, dealer, or exhibiter. 3. It is based on the principle of one against the many—the keeper, dealer, or exhibiter against the betters, directly or indirectly. 4. It must be exhibited—that is, displayed for the purpose of obtaining betters.

Any change, cover, disguise or subterfuge in any such ingredients, or in relation to the structure upon which the game is exhibited, or the instruments by which the result is developed for purposes of evasion will not change the character of the game.

It is difficult to imagine any species of table, or bank, or gaming device, resembling either that is kept for gaming that would not be included in the clauses of the Code.

" Grand Raffle," as described and exhibited, is a " gaming table exhibited for gaming."

It is the province of the Court to determine what games " are said (in common language) to be dealt, kept, or exhibited."

Appeal from Shelby. Tried below before Hon. A. W. O. Hicks.

Indictment for keeping a gaming table for the purpose of gaming. The facts are in the Opinion.

*Moore & Walker*, for appellant.

*Attorney General*, for the State.

Roberts, J. This is a prosecution under the 412th Article of the Penal Code, which reads as follows, to-wit :

"Art. 412. If any person shall keep or exhibit for the purpose of gaming any gaming table or bank, of any name or description whatever, or any table or bank used for gaming which has no name, or shall be in any manner interested in keeping or exhibiting such table or bank at any place whatever, he shall be fined not less than twenty-five dollars nor more than one hundred dollars."

The indictment charged that the defendant "did keep a gaming table for the purpose of gaming;" and the proof showed that he exhibited a game called Grand Raffle, which is not one of the games mentioned specially in the Code in Art. 414. The questions presented are:

1st. Is this an offence?

2nd. Is it the raffle referred to in the Code in Art. 406?

3rd. May there be a gaming device, kept for gaming, which is not included in Art. 412 of the Code?

A game is a trial of skill, or of chance, or of skill and chance, between two or more contending parties, according to some rule by which each one may succeed or fail in the trial; of skill, as chess and billiards; of chance, as raffle and simple lottery; of chance and skill combined, as back-gammon, whist, faro, &c.

The instruments, by which the chance may be developed, and upon and about which the skill may be exercised, are various—as cards, dice, balls, figures, letters, chess-men, checks, &c.; and these may be operated on singly, or in double, trible, or even quadruple combinations.

Betting upon a game is the mutual agreement and tender of a gift of something valuable, which is to belong to the one or to the other of the contending parties, according to the result of such trial.

The ordinary rules of the game (where there are no special rules stipulated) constitute the terms of the agreement, and define the contingency upon which one or the other is to re-

ceive the gift. The staking of the money, or other property, is an ostensible adoption or sanction of such agreement, and also a conditional tender. When the trial is accomplished the result tells who is the winner.

This betting upon games is the evil which our law seeks to eradicate. This is endeavored to be done, not by prohibiting all games from being indulged in, but only particular classes of gaming which are thought to be most pernicious. Whether this broad margin, in the schedule of games, is left exempt from legislative reprobation from an apprehension of entrenching too largely upon the natural liberties of the citizen, or because they do not inflict upon the community calamities of sufficient magnitude to require punitory regimen, or because they are conceived to be innocent amusements, it is wholly immaterial—they are exempt. It is also a matter to be especially noted, that although betting upon games is the evil sought to be reached, there is but one single instance in which it is necessary to allege a betting, or to prove it either, on the part of the prosecution. (Penal Code, Art. 418–411.) In all other cases the sword of the law, when it strikes at all, thrusts at the shield and cover of the evil, the game. It is important in the interpretation and the administration of the law to keep in view the distinction between a game and betting on a game, or gaming, as it is called in the Code.

The prohibited games are divided into two classes, to-wit : 1st. Playing cards in particular places. 2nd. Gaming tables and banks everywhere. The first is merely a trial of skill or chance, one or both, between two or more persons generally each for himself or with partners, according to some rule by which each one may succeed or fail in the trial, and in which cards are the instruments of developing the chance or skill, or both ; and when played at particular places mentioned in the Code. No further reference will be made to the first class than is necessary in illustration of the second, as it is not now under investigation.

The second class is the species of games that the Legislature have most sedulously sought to repress. They have prescribed a general form of indictment without any other discription of name, quality, or incident than the keeping or exhibiting a gaming table or bank. (The offence of betting on such game by the betters is not now to be spoken of.) Such general form is intended to include every sort of such game, however variant from each other may be the particular facts constituting the offence in each case. In England it has been made sufficient to charge a person simply with having committed murder. In such cases, what facts constitutes murder in one case, or keeping a gaming table in the other, is matter of law to be expounded by the Judge; and whether those facts exist or not, is matter of fact to be found by the jury. Each must be expounded in the same way, by a discription or exposition of their essential elements.

In common with the first class, these games or gaming tables and banks come under the general definition of a game. There all necessary similarity ceases. As there is no specific deffinition of the offence given, it is important to ascertain what are the constituent elements of the games that are specified in the Code as coming under the second class, as faro, monte, &c., as well as to see how far the Legislature have expressed their intention.

The characteristic principle or element of the gaming tables or banks specified in the Code as faro, monte, &c., is that they have a keeper, dealer or exhibiter and operator on the basis of one against the many ; the dealer, keeper or exhibiter against the betters, directly or indirectly. In some of them this principle is obvious, the keeper betting directly against each and all the betters, and they against him, as in faro, vingt-un, &c. In others it is disguised and the betters seem to be contending against one another. Such is the case in pool and keno. The keeper charges and takes a per centage upon all the bets that are made, and is therefore interested in

stimulating and protracting the betting. The more is bet, the more he makes. And if the game continues long enough, he will have all the money and the betters have none ; then it is that the true principle of the game is unveiled—one against the many. Not so with billiards proper. The players rent the table for the time occupied in playing a game ; and the keeper has an equal interest, whether they play for thousands or for amusement. In some of the games this direct and indirect development of the principle of one against the many is combined. The keeper may have a fund of his own exhibited, called a bank ; which is usually money, but may be anything valuable ; and which is his conditional tender to all the betters, as in faro, &c. ; or he may collect and use the fund of the betters, as in keno. This is one mark of the distinction between gaming tables and gaming banks, and that is not well defined ; for some games may combine all the qualities of a table and bank, as roulette. The difference between the two can only be a modification of fact. It cannot be a difference of principle whether he has an original fund of his own, controls taxes by per centage, and pays out, or charges and takes a per centage out of the fund or bets contributed by the betters. By either mode he is equally made an active participant in the game. And hence the Code provides that it shall be sufficient in an indictment to state that he " exhibited a table or bank for gaming," and to prove that it was " played, dealt or exhibited, without proving that money or other articles of value was won or lost thereon." (Arts. 416 and 417.)

The structure upon which the chances or skill, or both combined, are developed, with cards, dice, balls, &c., is usually a table of some sort, in all such games. Any attempted evasion however in this respect could not change them or prevent them from being indictable games. And the same may be said of the evasion or change of the instruments of developing the chance or skill, as cards, dice, balls, &c.

In addition to mentioning certain games, to-wit : faro, monte, vingt-un, rouge et noir, roulette, A. B. C., chuck luck, keno, pool, and rondo, as examples by which the essential elements of a gaming table and bank could be known and determined, the Code expressly states, by way of explanation, that it is intended to "include every species of gaming device, known by the name of table or bank of every kind whatever ; " and lest there should still be some escape, it is added, that it shall be " construed to include any and all games, which in common language are said to be dealt, kept or exhibited." (Art. 413.)   Thus has the Legislature adverted to the games in use, known by the name of table or bank, and to those that are, in common language, said to be dealt, kept, or exhibited, as well as those specially named, by which the judicial mind should be informed, as to what constituted offences under this law.

The leading elements, then, of a gaming table or bank, as deduced by analogy from the specified games, are :

1st. It is a game, according to the general definition.

2nd. It has a keeper, dealer, or exhibiter.

3rd. It is based on the principle of one against the many ; the keeper, dealer, or exhibiter against the betters, directly or indirectly.

4th. It must be exhibited, that is, displayed for the purpose of obtaining betters.

Any change, cover, disguise, or subterfuge, in any such ingredients, for purposes of evasion, would not change the character of the game.

There are other games, falling under this head, (according to the intention of the Legislature as explained in the Code,) which do not, or at least may not, combine all these elements fully.   As for instance, " every species of gaming devices known by the name of table or bank."   Also, " any and all games, which, in common language, are said to be dealt, kept, or exhibited ;" and also, " any game played for money on a

billiard table, or table resembling a billiard table, other than the game of billiards licensed." (Art. 413–4.) No speculation will now be indulged, as to what games must be included under these clauses of the Code, as it will be found to be not necessary to the present investigation. Their scope may be better defined, when cases arise under them. It might be proper to remark, however, by way of caution, that it is difficult to imagine any species of table or bank, or gaming device, resembling either that is kept for gaming, that would not be included. Parties are liable to be misled by the words table and bank, by attributing to them a meaning too restricted and literal.

Let us apply, in the next place, the rule we have adduced, by analogy from the enumerated offences, to the case before us.

Is "grand raffle," as exhibited by defendant, a gaming table or bank? The raffle, which is in common use, and which is not prohibited by the Code, (Art. 406,) (should the property raffled for not exceed five hundred dollars,) is a game of perfect chance ; in which every participant is equal with every other, in the proportion of his risk and prospect of gain. The prize is a common fund, or that which is purchased by a common fund. Each is an equal actor in developing the chances, in proportion to his risk. Whether they be developed with dice, or some other instrument, is not material. The successful party takes the whole prize, and all the rest lose. The element of one against the many, the keeper against the betters, either directly or indirectly, is not be found in it. It has no keeper, dealer, or exhibiter.

Very different however is "grand raffle," as it is developed by the evidence in this case. There are fifty prizes of jewelry, &c., placed on the numbers from ten to sixty, the whole not amounting to over five hundred dollars in value. Every person, paying fifty cents, is entitled to a throw with ten dice, which, when thrown, will exhibit numbers in the aggregate, not less than ten, nor more than sixty. The prizes are not

less than twenty-five cents, and not more than one hundred and twenty-five dollars each. The highest prizes are placed on the numbers, which are the most difficult to throw, as 10, 11, 12, &c., and 60, 59, &c. The small prizes are placed on the medium numbers, that is, both ways from the number 35. At every throw, the better must get a prize of twenty-five cents at least; and in that case, if he does not want the prize, the keeper hands him back twenty-five cents in money, and retains the jewelry. The effect of the whole contrivance is, that the better gives the keeper twenty-five cents for the improbable chance of winning some of the tempting prizes. The jewelry is the lure to the crowd. The real fund, which the better stakes his money against, is the money in the keeper's pocket, or on his table, as he may choose to keep it. On the side of the betters, it is a game of perfect chance. On the side of the keeper, there are both chance and skill. And his skill is exercised in so placing the prizes of any value that the better will have but a remote possibility of winning them. The betters, however numerous, may all throw in turn for the same prizes, which may still remain on the table, being paid for by the keeper, if accidentally won by any better. Here is found the leading characteristics of a common gaming table or bank—one against the many—the exhibiter with an interest in the game against the betters, and that not disguised even. Instead of being similar to the fair game of raffle, as contemplated in our Code, it is one of the most fraudulent devices ever heard of, bearing the name or semblance of a game, and deserves no better designation than that of a petty swindle. That it is shown to have been exhibited "for gaming"— that is for the purpose of being bet on—is beyond any question. (Code, Art. 417.)

Upon the trial of the case, as shown by the bill of exceptions, "a witness being asked to describe the manner in which the said goods were thrown for by the betters, (or those taking chances,) defendant objected, (to the testimony,) if the

object was to show any species of gambling device, other than a gaming table or banking game, which objection was overruled, because the Court is of opinion that any game, exhibited for the purpose of gaming, is a gaming device, gaming table or bank, prohibited by the Statute."

This same view, upon which the Court overruled the objection to the evidence, is carried into the charge to the jury, after reading to the jury the Sections of the Code creating and explaining the offence. (Secs. 412–3–4–5–6–7.)

The 413th Article of the Code says, that the clause under which this indictment was found, and to which it conforms, " shall be construed to include any and all games, which, in common language, are said to be dealt, kept, or exhibited." Who is it that must determine what games are said (in common language) to be dealt, kept, or exhibited,—the Judge or the jury? If the jury, it must be on the evidence of witnesses, as to what is said. What is said, in common language, as to a particular game being dealt, kept, or exhibited, in Western Texas, may not be said in Eastern Texas; and the proof of it one year might be very different from what could be made the next; for " common sayings," in reference to games, may be manufactured, changed, or abolished in that time; and the preponderance of proof of them would of course be made to conform to such alteration by those interested in exculpating themselves. It was hardly intended to place the existence or non-existence of any offence upon any such fluctuating contingencies.

Article 412 prohibited the keeping or exhibiting a gaming table or bank—of every sort, of every name, and of no name. The regular games of this class, known throughout the world, whether yet introduced here or not, are certainly comprehended in this enactment. But the Legislature designed something more by it. They anticipated that disguises, shifts and subterfuges would be resorted to, by which the regular games

of this class would be changed, or new ones invented ; and yet they would be none the less known and understood—by persons understanding the subject at all, and often by the community at large—to be games of this class. (Crow v. The State, 6 Tex. R. 334.) Intending to include all such gaming devices, (as they have said in Code, Art. 413,) they furnish, to those who are to administer the law, a test (not the only test) by which the games of this class, whether regular or irregular, or mere inventions, are to be distinguished ; and that is, when they are said to be dealt, kept, or exhibited : not "said," by one class or one section ; but said in common language. Nor does the Judge on the Bench have to derive his knowledge, that it is so said, by the proof of witnesses, and the verdict of a jury, in every county in which he goes. This test indicates and presupposes a quality or fact in the game, by which the class to which it belongs may be known. And although gamblers might change the name of the quality or fact, and call it something else, still the Judge, knowing what it was "commonly called," should nevertheless pronounce it an offence. It may be well to illustrate this. In the regular games of this class there is always a dealer, keeper, or exhibiter, who has an interest in the game directly, or indirectly. And it is for this reason he is the keeper. If a party should establish in his house a table, for gaming purposes, and carry it on himself without betting upon it himself, but to enable others to bet, (as in pool,) and should, instead of charging a per centage upon the bets, depend upon the custom of the betters at his bar, to compensate him, the evil would be no less, because he perhaps made less. He might even not be present all the time during the playing, in some such case that might be devised. Here, although, according to the rules of such games, he could not strictly be said to be the keeper, or exhibiter, still the community would not be misled by such a change in the mere mode of deriving his gains ; and it would be said "in common language," that he kept or exhibited the table. And

the same would be said, doubtless, in the case of one who might keep such table without any expectation of profit. Which, however, is hardly a supposable case.

Thus it has been seen, that it is evidently the intention of the Legislature to extend this prohibition over every possible game, falling under this class of gaming tables and banks, however regular or irregular they may present themselves, or what may be their disguises. Whether they intended to extend it beyond that, and include every possible gaming device that has been or may be invented and exhibted, is not now a practical question. Cases under the law should be decided, as they arise for judicial determination, and should not be made to depend upon what might possibly, or what might not possibly be included in it theoretically.

The true question that should govern a trial is, does this case, now on hand, come safely and certainly under the law ?

The State offered proper evidence to prove the charge in the indictment, to-wit : that defendant " did keep a gaming table for the purpose of gaming." The defendant objected to this evidence conditionally ; that is, if offered by the State to prove a gaming device other than a gaming table. The Court might well have declined seriously entertaining such a question thus presented. The evidence was admissible under the indictment, and that was not questioned. But it was objected to its being received, to prove anything out of the indictment. Anything out of the indictment was not then being tried.

If the counsel differed with the Judge, as to what was included in the indictment, and that difference of opinion was about to be prejudicial to his client, he should have made the question upon the charge ; and more appropriately, by asking a charge, having reference to the facts in proof. If such difference of opinion could have no application to the facts before the jury, the client could suffer no injury, even if his counsel were right in the matter, and the matter of difference would be harmlessly settled, by the Court rejecting the charge, as asked ; because of irrelevancy, or any other reason, that

might for the moment be assigned. Had the defendant asked a charge on this difference of opinion, to-wit: "that there might be some gaming devices, kept for gaming, which the jury could not consider under this indictment," it would have been inapplicable of course. If he had asked the Court to charge the jury, "that if they believed that defendant offered a certain amount of jewelry, not exceeding five hundred dollars, to be raffled for, and that a number of persons, then present, accepted the offer, made up the shares, the shares being one dollar or ten dollars each," &c., (going on to describe a raffle as contemplated in the Code,) would the Court have been bound to have given it in charge. Unquestionably not. For there would have been no possibility of so construing the evidence, so as to make the facts in such charge correspond with those before the jury; and without some probability of such correspondence, the charge would not only be useless but even improper. This has been repeatedly decided by this Court.

The evidence was clear, positive and without conflict, and described a gaming table as plainly as any description can be given of roulette. The Court read the articles of the Code, pertaining to the subject; and if that be admitted, which we decline now to decide, to-wit: that the charge of the Court in relation to keeping a gaming device, for the purpose of gaming, is erroneous, we think it was not required by the facts, and was not, in this case, calculated to mislead the jury to the defendant's prejudice. Though a Court might, and indeed should, be extremely cautious in withholding a new trial for an error of the charge, yet even in cases of murder it has been held, that where it was clear from the facts in the case that the jury arrived at the only conclusion of which the facts admitted, and the charge, though erroneous, could not possibly have operated to the prejudice of the defendant, the Court would not set aside the conviction. (2 Comstock's R. 193, 202, 203 ; O'Connell v. The State, 18 Tex. R. 343.)

In the case referred to from Comstock, the erroneous charge

related to justifiable homicide; and the Court say that the facts show that there could have been no question about its being a case of justifiable homicide. Here we might say that there could be no question about this being a gaming device, which was not a gaming table.

More attention has been bestowed on this case than its importance would seem to require. It has been given, not from anything peculiar or uncommon found in it, but from a belief that the unmistakeable desire of the State to ferret out and exterminate the vice of gaming may be greatly promoted by a more thorough knowledge of the subject of the offence, (for Court-house use at least,) on the part of those whose duty it is to administer the law.

Judgment affirmed.