## HOFFMAN et al. v. STATE.

### No. 14067.

Court of Civil Appeals of Texas. Dallas.

April 1, 1949.

Bowyer, Gray, Thomas, Crozier & Jaffe, of Dallas, for appellants.

Will Wilson, Jr. Dist. Atty., and R. H. Singleton and T. M. Reavley, Assts. Dist. Atty., all of Dallas, for appellee.

YOUNG, Justice.

This is an appeal from grant of a permanent injunction restraining appellant from using certain described premises "as a place where persons resort for the purpose of gambling and as a place for gaming, keeping and exhibiting games prohibited by the laws of the State of Texas, and as a place for the purpose of keeping, exhibiting and playing the game commonly known as 'Bridgo.'" Suit was maintained by the District Attorney under Arts. 4664, 4666 and 4667, Vernon's Ann.Civ.Sts., which declare to be a common nuisance the use of "any hotel, rooming house or boarding house, country club, garage, rent car stand or other place * * * where persons resort for the purpose of gambling * * *" (Art. 4664); or "for gaming or keeping or exhibiting games prohibited by law. * * *" (Art. 4667) Defendant below denied all charges of law violation, or maintenance of nuisance, claiming that his operation on the premises was a perfectly legal game or contest.

The cause was tried principally on agreed facts disclosing that the "Dallas Bridgo Center" was located on a business block in East Dallas, with Entertainment Enterprises Corporation, a Texas corporation, as lessee, and defendant Hoffman Vice President; that the game there played was open to the public with accommodations for approximately 120 persons at one time. Here we quote from agreed stipulations which describe the equipment and conduct of appellant's game, "Bridgo": "There is first a game of skill in which each participant attempts to line colored balls in the holes in a box consisting of thirtysix (36) squares. This box is four feet from the counter at which participants sit and is surrounded on each side by a glass panel. To play the game, the participants must buy at least two blue balls at the price of ten cents each. The participants throw these balls into the above described thirtysix-hole box. He is then given all the red balls he wants free of charge. The object of the game is to have a row of six balls horizontally, vertically or diagonally. Each row must contain one blue ball and the winner of the game is the person or persons who form a row of six balls using the smallest number of red balls. It is possible for several people to win each game. The prize is token redeemable in free plays of the game. After each of the games as above described and after a two or three minute break, there is a game played in the manner in which the game known as Bingo is played. The defendant refers to this as a relaxation game to distinguish it from the ball game known as the skill game. The cards for this game are kept in a rack in front of each participant and each participant takes any number of cards he wishes. The numbers on the cards are covered with markers by the participants as the numbers are called out by the management following their chance drawing from a container. The first person to cover the numbers on a card in a vertical, horizontal, or diagonal line is the winner and receives a certificate redeemable in United States money. There is no charge for participating in this game and the participants may play this game even if they have not played the above described ball game. The only game for which the management requires payment of money from the participants is the ball pitching game. Before the defendant began operating this game, he submitted through his attorney a description of the game to the District Attorney's office and asked for the Attorney General's opinion concerning the legality of such a game. The District Attorney did not submit this request to the Attorney

General and the District Attorney made no attempt to stop the installation of the game and took no action until after the game had been in operation for ten days. The defendant is continuing to conduct this game of Bridgo in the aforesaid manner on the above premises and will continue to do so unless ordered to cease by a court of competent jurisdiction. The premises are leased from Leo F. Corrigan. All employees of the defendant have written instructions to the effect that there is no necessity for participants to play the skill game in order to play the relaxation game (above referred to as the game similar to the one commonly known as Bingo). They are further instructed that absolutely no money is to be taken from any participant in order to play the relaxation game. The number of cards which any player takes in the relaxation game is optional with the player and has no relation to the number of blue balls which he buys in the skill game. There are signs printed on the placards and placed on the walls of the above premises setting up the rules of the game. These signs read as follows: 'Bridgo is a game of skill and science. Player must toss blue balls (pay balls) one at a time into bin directly in front of player. Player then proceeds to toss red balls (free balls) one at a time as directed by announcer. Endeavoring to complete a row of six balls in a straight line. A complete line must have at least one or more blue balls. The player who uses the lowest total number of red balls to complete a row is the winner of the game. The winner will receive tokens, exchangeable to play additional games, of Bridgo. Tokens Are Not Redeemable For Cash. * * * Entertainment and activity conducted during recreation period are absolutely *without charge*. All persons may enjoy and participate therein whether or not they have played the skill game. * * * No minors nor any intoxicated or disorderly persons will be permitted to participate in any games or activity. Infraction of any rule is sufficient reason to bar the offender from further participation in any game * * *.' Either party may introduce additional testimony at the time of the trial."

It was also agreed that a good many witnesses testified to playing the above mentioned relaxation game in appellant's place of business at various times without payment of money and without having played the "game of skill." These witnesses included a captain of Texas Rangers who was checking on the game and a member of the staff of the Dallas County District Attorney; further that from time to time, prizes on the relaxation game were substantial sums of money, the amount of $400 having been offered as the prize on at least one occasion. We might add to the above statement that when a winner of said relaxation game is declared, the procedure was to start another skill game, the cycle continuing until close of business for the day.

It is implicit in the foregoing set of facts that the round of entertainment offered to each customer consists of two phases, (1) a so-called game of skill for which a money charge is made, with free games to the successful participants; (2) a game of relaxation known as Bingo with no charge for entry but with a winner's prize ranging from a minimum of $15 to a maximum of $400; and it is this method of business or use of equipment that appellee assails as violative of Arts. 619, 654, our Penal Code, providing (619): "If any person shall directly, or as agent or employe for another, or through any agent or agents, keep or exhibit for the purpose of gaming, any policy game, any gaming table, bank, wheel or device of any name or description whatever, or any table, bank, wheel or device for the purpose of gaming which has no name, or any slot machine, any pigeon hole table, any jenny-lind table, or table of any kind whatsoever, regardless of the name or whether named or not, he shall be confined in the penitentiary not less than two nor more than four years regardless of whether any of the above mentioned games, tables, banks, wheels, devices or slot machines are licensed by law or not. Any such table, bank, wheel, machine or device shall be considered as used for gaming, if money or anything of value is bet thereon." Art. 654 (Lottery): "If any person shall establish a lottery or dispose of any estate,

real or personal, by lottery, he shall be fined not less than one hundred nor more than one thousand dollars; or if any person shall sell, offer for sale or keep for sale any ticket or part ticket in any lottery, he shall be fined not less than ten nor more than fifty dollars." Also in the same connection appellant cites Art. 621, reading: "The following games are within the meaning and intention of the two preceding articles, viz.: Faro, monte, vingt et un, rouge et noir, roulette, A.B.C., chuckaluck, keno and rondo; but the enumeration of these games shall not exclude any other properly within the meaning of the two preceding articles."

Appellant first argues that his Bridgo game (the ball-throwing feature) is admittedly and in fact one of skill and such as the statutes against gaming were never intended to cover; as opposed to pure games of chance with associated gambling or betting. We will consider the ball-tossing device as a game of skill in accordance with stipulations, though the question of whether it was predominantly of such character, if open, would appear debatable. However, the point need not be argued. Our courts have construed Arts. 619, 621 and 625 as drawing no distinction between games of chance and games of skill, but as condemning all games upon which money or "anything of value" is staked or waged on the outcome; taking the view, in short, that playing a game, whether of skill or chance, for money or "*other thing of value*" constitutes gambling or gaming. Adams v. Antonio, Tex.Civ. App., 88 S.W.2d 503, (writ refused); Callison v. State, Tex.Civ.App., 172 S.W.2d 772. "This betting on games is the evil our law seeks to eradicate." Stearnes v. State, 21 Tex. 692, 693. Texas courts further hold that amusement is a "thing of value" and that free games won on marble machines at least are within condemnation of the statutes. State v. Langford, Tex.Civ.App., 144 S.W.2d 448; Hightower v. State, Tex. Civ.App., 156 S.W.2d 327 (writ refused). There being no material difference between the instant ball-tossing device and the operation of a marble board, except that here the balls are manually propelled, we do not think appellant is in any better position to claim immunity than that occupied by keepers in the Langford and Hightower appeals where the devices were held unlawful.

However, we may be in error in giving the described amusement a classification along with automatic or mechanical devices, for the element of gaming incident thereto is negligible; and, standing alone, it is not made the center of appellee's attack. It is these games taken together that the State characterizes as a lottery, possessing the usual ingredients of a money prize, chance and consideration; to which appellant strongly argues the total absence of consideration, in that his Bingo contest is free. But we are not foreclosed by the owner's mere assertion of no consideration (which may be furnished directly or indirectly by the participant). "Courts will inquire, not into the name, but the game, to determine whether it is * * * prohibited * * *." Smith v. State, 17 Tex. 191. Hence for the consideration necessary to a lottery scheme, we must look to the facts of the particular case and its reasonably deducible inferences.

Our agreed stipulations do not disclose the source of the money awards following this game of relaxation (Bingo); but defendant was occupying leased premises, undoubtedly carrying on a business for profit. We may properly assume, therefore, that his outlay in money prizes, consequent upon Bingo, was entirely dependent upon intake at the box office, i. e., admissions of participants in the skill game, and bearing a relationship to these admission fees in some fixed ratio or percentage. Similarly we may properly infer, from the substantial sums of money paid out on relaxation games, with the allure of chance awards to one and all, that defendant's amusement center was not lacking in a steady and substantial flow of customers. Here it may be observed that the cards for Bingo were kept in a rack in front of participants; two of whom testified in supplemental statement of facts that some inducement to their attendance at defendant's establishment was the chance to win a cash prize. However strenuously appellant may contend that his exhibition of chance for a money prize was free, we con-

clude that the fees exacted of those who came to enjoy his cycle of amusement supplied the element of consideration; the business, as a result, assuming every aspect of a lottery within the meaning of the statute; based, as it is, on Art. 3, sec. 47 of our Constitution, Vernon's Ann.St., reading: "The Legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as the sale of tickets in lotteries, gift enterprises or *other evasions involving the lottery principle*, established or existing in other States." (Emphasis ours.)

In Society Theatre v. City of Seattle, 118 Wash. 258, 203 P. 21, 22, a leading case, the plan of an association of merchants, manufacturers and growers was to advertise products of their members by furnishing merchandise and supplies to be given away; making arrangements with certain moving picture theaters to permit distribution thereof by means of numbered tickets among patrons after their admission to the theater in the usual manner. Following a regular performance the association would conduct a drawing by lot, those holding fortunate tickets receiving prizes. The theaters had nothing to do with giving out the tickets for prizes or their distribution, making no extra charge for admission. The result constituted a lottery, said the court, holding: "It needs no argument to show that the second and third elements appear in the business conducted by respondent. But it is argued that the element of consideration does not appear because the patrons of the theaters pay no additional consideration for entrance thereto, and pay nothing whatever for the tickets which may entitle them to prizes. But while the patrons may not pay, and the respondents may not receive any direct consideration, there is an indirect consideration paid and received. The fact that prizes of more or less value are to be distributed will attract persons to the theaters who would not otherwise attend. In this manner those obtaining prizes pay consideration for them, and the theaters reap a direct financial benefit."

In short, we find in appellant's modus operandi just another practice in a new setting of the old bank night principle or method of business, heretofore held illegal by both Courts of Criminal Appeals and our Supreme Court. Cole v. State, 133 Tex.Cr.R. 548, 112 S.W.2d 725; City of Wink v. Griffith Amusement Co., 129 Tex. 40, 100 S.W.2d 695.

The parties here are well familiar with "Bank Night" as recently conducted, and its methods need not be described. In Cole's appeal, supra, the theater proprietor was found guilty of violating the lottery statute in his manner of operation. On rehearing, and with reference to the "indirect consideration" necessary to a lottery, the court, through Judge Graves, said [133 Tex.Cr.R. 548, 112 S.W.2d 731]: "As pointed out heretofore by Judge Hawkins, such consideration might come from the increased attendance of persons who pay the required sum, some of whom are brought to such theater for the practically sole purpose of participating in such drawing and being personally present in order to claim the prize, should their number be drawn. The donor of such prize is surely offering the same in order to increase attendance upon his show, and surely expects to have more people there at bank nights than would otherwise be present, and in their added attendance, and the money received therefor, he finds the consideration for his munificence."

In City of Wink v. Griffith Amusement Co., supra [129 Tex. 40, 100 S.W.2d 701], the Supreme Court held: "Defendant in error's 'Bank Night' plan was obviously an evasion of the lottery laws by the avoidance of a direct charge for prize chances (all other elements of a lottery being present), but, nevertheless, having the object of enriching the defendant in error by the 'chance' of gain just as much as though a direct charge had been made therefor, manifestly an attempted 'avoidance' of the lottery statute 'by artifice' in accordance with the generally accepted definition of 'evasion'"; and further that "If it be granted that the plan of defendant in error's 'Bank Night' was not a lottery because a charge was not made for the registration entitling one to participate in the drawing (and this is the only distinction which is here or could be made), then it clearly comes within the condemnatory

terms of the Constitution, because it is a 'gift enterprise' involving the lottery principle, which the authorities hold is that principle by which something is to be given by chance." Judge Cureton cited with approval the case of Featherstone v. Independent Service Station Ass'n, Tex.Civ. App., 10 S.W.2d 124, 126, for which reason the following conclusions of this court, through Judge Looney, though lengthy, are quite pertinent: "We readily agree to the correctness of the proposition that, if tickets given by defendants and other members of the association were gifts, unsupported by a consideration moving from the ticket holder, were in fact gratuities pure and simple, the lottery statute was not violated, for the evident reason that a person is at liberty to give away his property, by chance, at a drawing to ticket holders, or in any other manner, without violating the law. But is the case at bar of that nature? We do not think so for the following reasons: The change wrought as testified to by defendants was not a change in the scheme itself, but merely in the procedure or method of executing the same. Instead of giving a ticket to a customer for every dollar's worth of merchandise purchased, they gave tickets to whomsoever they pleased—customers and noncustomers as well. * * * While dealers, under the new plan, distributed tickets to noncustomers as well as to customers, it seems that the scheme was to distribute tickets, in the main to customers, as the evidence discloses that only a few, negligible in number, were given to persons other than customers. That the giving of tickets, and the drawings and distribution of prizes, were inducements to patronage and unquestionably lured customers, is shown from the very satisfactory business results that followed. Patronage thus induced was the consideration that passed from the ticket holder for the chance received, in that the price paid, whatever it was, the amount being immaterial, constituted the aggregate price for the merchandise or service and the ticket that represented a chance to win the prize; in other words, for one undivided price both were purchased, the merchandise, or service, and ticket, the ticket being as much bought as though priced separately. State v. Danz, 140 Wash. 546, 250 P. 37, and annotations 48 A.L.R. 1109, 1122. We are of the opinion, therefore, that the court did not err in concluding that the facts constituted a lottery within the meaning of the law."

We think the principle inherent in above cases is likewise applicable to appellant's business, viewed as a whole and in its practical operation. Our Constitutional provision against lotteries "or other evasions involving the lottery principle" (Sec. 47, Art. 3) is strongly worded, the same or similar language appearing in all preceding Constitutions; being uniformly construed "with a view to remedying the mischief intended to be prevented, and to suppress all evasions for the continuance of the mischief." 54 C.J.S., Lotteries, §.19, p. 862. "Where the question presented is one of enforcing criminal responsibility, or of refusing to aid in a transaction alleged to be within the statutory prohibition, the courts will ordinarily construe liberally the provisions relating to lotteries so as to include all schemes which appeal to the gambling propensities of men." State ex rel. Beck v. Fox Kansas Theatre Co. 144 Kan. 687, 62 P.2d 929, 933, 109 A.L.R. 698.

Man's ingenuity has been fertile in the invention of schemes and devices for the purpose of satisfying at least the letter of these enactments (Const. sec. 47, Art. 3; Art. 654, Penal Code). But considering the liberal construction heretofore accorded to them, and, in slight paraphrase of the oft-quoted statement from Long v. State, 74 Md. 565, 22 A. 4, 12 L.R.A. 425, 28 Am. St.Rep. 268, we venture the following assertion: That we believe it almost impossible for the most ingenious and subtle mind to devise any scheme or plan, *short of a gratuitous distribution of his own property,* that will not be held by the courts of this State as in violation of the foregoing statute.

Contrary to the contention of appellant, the instant proceedings for injunctive relief is authorized under Arts. 4664, 4666 and 4667, Vernon's Ann.Civ.Sts. The latter article has been definitely made applicable to a lottery. See State v. Robb & Rowley United, Tex.Civ.App., 118 S.W.2d

917, 918, Syl. 3, holding, with reference to Art. 4667, "A statute authorizing the state to enjoin the use of any place for gaming included lotteries, as against contention that lotteries were not intended in view of special consideration given lotteries as distinguished from other forms of gaming, since the term 'gaming' includes lotteries."

In harmony with the conclusions above reached, all points of error are overruled and judgment of the trial court is affirmed.