## WISHING WELL CLUB, Inc. v. AKRON (City).

Common Pleas Court, Summit County.

No. 180436.   Decided June 30, 1951.

Bernard Amer, L. A. Lombardi, Akron, for plaintiff.
Nathan Koplin, Akron, for defendant.

## OPINION

By COLOPY, J.

This is an action brought by the plaintiff, Wishing Well Club, Inc., to obtain an order permanently restraining the defendant, the City of Akron, a municipal corporation, operating under a charter, from arresting and prosecuting its officers, employees and members, on charges connected with its business of conducting bingo and keno games.

The State of Ohio issued the plaintiff's corporate charter, not for profit, in September 1948. The articles of incorporation, in part provide:

"The purpose or purposes for which said corporation is formed are: To foster and cultivate the social relations of the members; to encourage among the members closer personal acquaintance; of providing entertainment, amusement and meeting place for its members, their families and friends; all, with the primary purpose to provide for the creation and maintenance of funds or credits for aiding in community growth or development or of charitable, philanthropic or benevolent instrumentalities conducive to public welfare."

According to the plaintiff's financial statements, its gross income, between January 31, 1949, and March 31, 1951, was $654,020.15. Its donations to charities, according to the same statements for said period amounted to $2775.79. It paid its manager, a part time employee, $10,000 per year and its assistant manager, a full time employee, a like amount. It does not appear from such records that the plaintiff corporation has retained for itself any part of its income.

The games were played in the manner described by plaintiff as follows:

"1. That in playing Bingo or Keno, cards are sold to the participants of the following character:

"(2) Sofar as Bingo cards are concerned, across the top of the card are the five letters making up the word 'Bingo.' The card itself contains 25 squares. In the 5 squares under the letter 'B' are numbers from 1 to 15 inclusive. In the next column of squares under the letter 'I' are numbers from 16 to 30 inclusive. In the column under the letter 'N' the 3rd square down is marked 'Free' and in the other 4 squares are numbers arranging from 31 to 45 inclusive. In the column of squares under the letter 'G' are various numbers from 46

to 60 inclusive and in the column of squares under the letter 'O' are numbers from 61 to 75 inclusive. It will be observed that every Bingo card uses 24 numbers arranging from 1 to 75 inclusive. The Keno card consists of 27 squares, 9 squares across and 3 squares down. There are 15 numbers printed on the card. In the 1st column are used, numbers 1 to 10 and in the 2nd column 11 to 20, and the 3rd column 21 to 30, and the 4th column 31 to 40 and in the 5th column 41 to 50 and in the 6th column 51 to 60, and in the 7th column 61 to 70, and in the 8th column 71 to 80, and in the 9th column 81 to 90.

"Cards are sold covering a series of games, the prizes to be given being announced before the session.

"In both Bingo and Keno, the caller is seated at a machine known as a blower to which is attached a container holding 75 balls numbered from 1 to 75, while if Keno is being played, the balls are numbered from 1 to 90. The blower causes the balls to rise in the air and one of the balls alights into a cup and from the cup into a tube from which the ball is taken by the caller and the number is announced. The player having a card with such number on it covers such number. This operation is continued until the game has been completed.

"When playing Bingo the prize can be given to the player first covering all of the numbers upon his card. This is called a full card game. The game can be played by giving the prize to the player first covering one line of the card whether such line is horizontal or perpendicular. This is called a single line game. The prize could also be given for the player first covering one line and the 4 corners or various other variations. In playing Keno, the winner either covers one, two or three lines of his card.

"Each card that is sold has a certain identification number on it so that there can be no question that the player is using a card furnished by the Club operating the game.

"It is possible for two or more players to complete their game at the same time. If the cards are duplicates, then duplicate prizes are given. If they are not duplicates, then the prize is divided. As the operator calls the numbers, the ball marked with such number is placed in a master rack and after a player has completed, the card is checked with the master rack to make certain that such player has properly completed the game. When the game is finished, all of the balls are returned from the rack to the container for the next game. That attached hereto and made a part hereof are sample Bingo and Keno cards."

The City Ordinances, in force and effect, provide as follows:

"Section 75. Lottery Tickets. Whoever buys, vends, sells, barters or disposes of a ticket, order or device for, or representing a number of shares or an interest in a lottery, 'Policy,' or scheme of chance by whatever name, style or title denominated or known, whether located or to be drawn, paid, or carried on within or without the City of Akron" shall be punished, etc.

"Section 76. Promoting Schemes of Chance. Whoever establishes, opens, sets on foot, carries on, promotes, makes, draws, or acts as 'Backer' or 'Vendor' for, or on account of, or in any way concerned in, a lottery, policy, or scheme of chance, by whatever name, style, or title denominated or known, whether located or to be drawn, paid, or carried on within or without the city of Akron, or, by any of such means, sells, or exposes for sale anything of value," shall be punished, etc.

"Section 77. Lotteries. Any person who shall be or become the possessor, custodian or depositary of any pools, lottery 'policy,' numbers slips or papers, treasury slips or papers, scheme of chance, money, property or thing of value, in any manner wagered, or bet upon any result or event, or of any apparatus, device, sheets, slips, tickets, or books of any kind by whatever name, style, or title denominated or known, designed or used for the purpose of facilitating, enabling or assisting in gambling or buying or selling any such pools, lottery 'policy,' numbers operation, treasury slip operation, or scheme of chance, or making any such wagers or bets" shall be punished, etc.

The plaintiff's contention that its operations are lawful seems to be represented by these propositions:

1st,—its games are not lotteries and, consequently, do not fall within the prohibition of **Art. 15, Sec. 6, of the Constitution of Ohio.**

2nd,—That §§13063, 13063-1, 13064 and 13064-1 GC, as amended by the General Assembly in 1943, grants a privilege to persons to operate schemes of chance which are not lotteries, providing they are not conducted "for profit."

3rd,—The ordinances and the Statutes aforesaid are in conflict and, consequently, the ordinances must therefore be considered invalid under the rule laid down by the Supreme Court in **Neil House Hotel Co. v. City of Columbus, 144 Oh St 248,** 58 N. E. 2d 665, and earlier cases. And

4th,—A court of equity should protect property rights by issuing an injunction against enforcement of invalid criminal laws, under the rule announced by the Supreme Court in **Olds v. Klotz, 131 Oh St 447, 3 N. E. 2d 371.**

I consider a lottery to be any scheme for the distribution of

prizes by lot, in which the elements of "consideration," "prize," and "chance," are present. See **Sec. 25 O. Jur., page 811; 34 Am.** Jur. page 646; Words and Phrases, Lottery, and citations therein.

The Ohio Supreme Court, in the case of **Stevens v. Cincinnati Times-Star Co., 72 Oh St 112, at page 147,** 73 N. E. 1058, cites with approval definitions of the word "lottery," that are substantially similar. The Constitution of Ohio uses the word "lottery" in no restricted or qualified sense. It expressly provides that "Lotteries, and the sale of lottery tickets, **for any purpose whatever, shall forever be prohibited.**" These words constitute an exceptionally strong and unambiguous declaration of public policy.

Since the plaintiff conducts Bingo and Keno in a manner that involves each and all of the said elements of consideration, prize, and chance, such games are necessarily lotteries. The Common Pleas Court of Cuyahoga County and the 8th District Court of Appeals, in the **Kraus v. City of Cleveland (CP 58 Abs 353, OA 58 Abs 360)** case, likewise concluded that Bingo was a lottery. 94 N. E. 2d 814, and **89 Oh Ap 504,** 96 N. E. 2d 314; Id., **155 Oh St 98,** 97 N. E. 2d 549. Plaintiff charges that the Courts in the Kraus case did not consider this specific question, but simply assumed that Bingo was a lottery. By reading of the opinions in that case leads me to believe that the courts gave the question real consideration. It cannot be denied that the Supreme Courts of Michigan, Wisconsin and Texas considered this question and determined that Bingo is a lottery and definitely violative of their respective constitutional provisions on the subject. Society of Good Neighbors v. Van Antwerp, 324 Mich. 22, 36 N. W. 2d 308; State ex rel. Trampe v. Multerer, 234 Wis. 50, 289 N. W. 600, and Hoffman v. State, Tex. Civ. App., 219 S. W. 2d 539.

Suppose that plaintiff's games are not lotteries, is its argument sound that the General Assembly, in enacting §§**13063, 13063-1, 13064** and **13064-1 GC,** in 1943, granted it the privilege of operating such games, providing it receives no profit therefrom?

**Sec. 13063 GC** provides

"Whoever, for his own profit, vends, sells, barters or disposes of a ticket, order or device for or representing a number of shares or an interest in a lottery or scheme of chance, by whatever name, style or title denominated or known, whether located or to be drawn, paid or carried on within or without this state," shall be punished, etc.

**Sec. 13063-1 GC** provides

"Whoever vends, sells, barters or disposes of a ticket, order

or device for or representing a number of shares or an interest in a scheme of chance known as 'policy,' 'numbers game,' 'clearing house' or by words or terms of similar import. whether located or to be drawn, paid or carried on within or without this state, shall, upon first conviction thereof," be punished, etc.

Sec. 13064 GC provides

"Whoever, for his own profit, establishes, opens, sets on foot, carries on, promotes, makes, draws or acts as 'backer' or 'vendor' for or on account of a lottery or scheme of chance, by whatever name, style, or title denominated or known, whether located or to be drawn, paid or carried on within or without this state, or by any of such means, sells or exposes for sale anything of value," shall be punished, etc.

Sec. 13064-1 GC provides

"Whoever establishes, opens, sets on foot, carries on, promotes, makes, draws or acts as 'backer' or 'vendor' for or on account of a scheme of chance known as 'policy,' 'numbers game,' 'clearing house' or by words or terms of similar import, whether located or to be drawn, paid or carried on within or without this state, or by any of such means, sells or exposes for sale anything of value shall," be punished, etc.

The aforesaid statutes define crime. They expressly prohibit certain acts. They grant no privileges of any sort or character, either by express language or by implication. It is true that there are no crimes in Ohio except such as are made so by statute.

But it does not follow from the General Assembly's mere failure to define an act as a crime that it thereby expressly authorizes a person to commit the act.

In the Parker case [State v. Parker, 150 Oh St 22, 80 N. E. 2d 490, 492], supra, the Supreme Court determined that "§13064 GC, is not in conflict but, so far as it goes, is in harmony with the * * * Constitution referred to." That Court stated, "It does not authorize or give validity to any gambling transaction." This same language appears, in my opinion, in the Parker case, supra, which was originally heard in this court. All that has been said with reference to §13064 GC has like application to the other said sections of the General Code.

There is no conflict between the city ordinances and the aforesaid statutes. On the contrary, harmony exists. The ordinances represent a reasonable and proper exercise of the police powers of the City of Akron. Their validity exists beyond doubt.

I am aware that some courts in this State, within recent weeks, have issued orders enjoining police officers from arresting Bingo operators, on the theory that such games are not lotteries and that they are not violative of any of the afore-

said statutes, so long as the operator receives no benefit therefrom. Certainly any individual who acts as an employee of any so-called corporation, not for profit, and receives pay for his services in any form or in any amount, has violated one or more of the statutes aforesaid. Criminal prosecutions in this connection are made against persons and not against the corporation. The employees of a corporation, not for profit, like the plaintiff, pay their employees.

Any injunction which in effect restrains officers from arresting such individuals receiving remuneration for their services, can have no reason whatever to support it.

Moreover, it seems to me that it would be necessary for a judge to completely close his eyes to certain other sections of the General Code, not heretofore mentioned, before he could grant such an injunction. I refer to §13054 GC, which makes it unlawful to keep a place for gambling, or being the owner, permits it to be so used; §13059 GC, making it unlawful to play any game for money or other thing of value; §13065 GC, making it unlawful to engage in any gambling for a livelihood; §13066 GC, making it unlawful to keep any gambling device; and §13067 GC, making it unlawful to give any publicity to a lottery or scheme of chance. These latter statutes were not modified in any respect. They have been in force for many years. It is inconceivable to me that Bingo or Keno could be played without violating one or more of them.

It is not within the judicial function to express any opinions as to the legislative policy which the various governmental units should adopt with respect to Bingo, Keno and any of the other numerous games of chance. This Court recognizes that many good persons look upon such games as an innocent and innocuous form of recreation. I have no doubt that the benefits from such games have frequently been applied to worthwhile causes. But in the various cases in which this Court has had a judicial question to determine in connection with Bingo operations, I have observed that the annual gross income of the corporation conducting the games has ranged from approximately a quarter of a million to a half million dollars, and that only token donations have been made to charity. These so-called corporations, not for profit. wear a cloak of fraud. Equity looks through form to substance. Behind these self styled "charitable corporations" stand the real parties in interest,—commercialized gamblers, taking huge sums of money for their own benefit. Money represents power. The corrupting influences that come from these operations must be obvious to every good citizen.

The statement of the Michigan Supreme Court in the 5th

syllabus, of the Society of Good Neighbors case, supra (324 Mich. 22, 36 N. W. 2d 308), is apropos here. "The foundation of court of equity is good conscience, and such court will not lend its aid by way of extraordinary writ of injunction to assist law violators."

The relief sought herein should be denied.

Defendant shall furnish an appropriate journal entry.