

# THE ATTORNEY GENERAL
## OF TEXAS

March 17, 1987

**JIM MATTOX**
**ATTORNEY GENERAL**

Honorable Bob Bullock
Comptroller of Public Accounts
L.B.J. Building
Austin, Texas 78774

Opinion No. JM-646

Re: Whether certain "give away" promotional games violate the Bingo Enabling Act

Dear Mr. Bullock:

You have asked about the legality of three games conducted by newspapers in the pages of their publications and one to be broadcast as a television game show for viewer participation. Each of them (variously called "Wingo," "Bingo," or "Banko") uses a format similar to that of a bingo game. The games are designed to promote newspaper circulation or to increase patron-traffic on behalf of local businesses. Free game materials are made available to potential players and it is not necessary to purchase anything to win.

The Texas Constitution requires the legislature to enact laws prohibiting "lotteries" and "gift enterprises." Tex. Const. art. III, §47. A 1980 amendment to that provision allows the legislature to authorize bingo games under certain circumstances:

> (b) <u>The Legislature by law may authorize and regulate bingo games</u> conducted by a church, synagogue, religious society, volunteer fire department, nonprofit veterans organization, fraternal organization, or nonprofit organization supporting medical research or treatment programs. . . . (Emphasis added).

Generally, the Bingo Enabling Act, article 179d, V.T.C.S., seeks to implement a constitutionally-contemplated regulatory scheme for legalized bingo games. A bingo game is defined by section 2(2) of article 179d to mean

> a specific game of chance, commonly known as bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random.

The definition of a bingo game is given more detail by section 39 of the Bingo Enabling Act -- the part of the statute that makes the conduct, promotion, or administration of an <u>unlawful</u> bingo game a crime.  It reads:

> (a) For the purposes of this section, 'bingo' or 'game' means a specific game of chance, commonly known as bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random, <u>whether or not a person who participates as a player furnishes something of value for the opportunity to participate.</u>
>
> (b) Any person conducting, promoting, or administering a game commits a felony of the third degree unless the person is conducting, promoting, or administering a game:
>
> (1) in accordance with a valid license issued under this Act;
>
> (2) within the confines of a home for purposes of amusement or recreation when:
>
> (A) no player or other person furnishes anything of more than nominal value for the opportunity to participate;
>
> (B) participation in the game does not exceed 15 players; and
>
> (C) the prizes awarded or to be awarded are nominal; or
>
> (3) on behalf of an organization of persons 60 years of age or over, a senior citizens' association, or the patients in a hospital or nursing home or residents of a retirement home solely for the purpose of amusement and recreation of its members, residents, or patients, when:
>
> (A) no player or other person furnishes anything of more than nominal value for the opportunity to participate; and
>
> (B) the prizes awarded or to be awarded are nominal.

(c) This section applies to all political sub-
divisions regardless of local option status.

(d) A game exempted by Subdivision (2) or (3)
of Subsection (b) of this section does not need to
be licensed.  (Emphasis added).

V.T.C.S. art. 179d, §39.  Your office has determined that the games in
question constitute "bingo" within the meaning of section 39.

In light of the concluding words of subsection (a) of section 39,
it is unnecessary to review cases decided under other laws that deal
with the use of advertising or merchandising promotions having a
"bingo," "gift enterprise," or "lottery" format.  See Brice v. State,
242 S.W.2d 433 (Tex. Crim. App. 1951); see also State v. Socony Mobile
Oil Company, 386 S.W.2d 169 (Tex. Civ. App. - San Antonio 1964, writ
ref'd n.r.e.); Hoffman v. State, 219 S.W.2d 539 (Tex. Civ. App. -
Dallas 1949, no writ); Attorney General Opinion JM-513 (1986).  The
payment of consideration, directly or indirectly by the participant,
is an essential element of the lottery offense under the Penal Code.
See Penal Code §47.01(6); Brice v. State, 242 S.W.2d at 434-35;
Attorney General Opinion JM-513 (1986).  The effect of the last clause
of subsection (a) of section 39 is to remove the element of considera-
tion from the specific criminal offense described in subsections (a)
of section 39, i.e., the conduct, promotion, or administration of a
"bingo" game as defined in subsection (a).  Since you have determined
that the games about which you inquire actually constitute "bingo"
within the meaning of section 39, they must be conducted in compliance
with subsection (b) regardless of whether a person who participates
as a player furnishes something of value for the opportunity to
participate.  Subsection (b) requires that a valid license be obtained
if the game in question fails to fall within two limited exceptions.
Whether the conduct, promotion, or administration of these games
without a license actually constitutes a third degree felony also
depends upon proof of all of the other elements of a criminal offense.
Because some of these games are conducted over television, you also
ask whether federal law preempts the Bingo Enabling Act.

Section 1304 of Title 18 of the United States Code provides:

Whoever broadcasts by means of any radio
station for which a license is required by any law
of the United States, or whoever, operating any
such station, knowingly permits the broadcasting
of, any advertisement of or information concerning
any lottery, gift enterprise, or similar scheme,
offering prizes dependent in whole or in part upon
lot or chance, or any list of the prizes drawn or
awarded by means of any such lottery, gift

> enterprise, or scheme, whether said list contains any part or all of such prizes, shall be fined not more than $1,000 or imprisoned not more than one year, or both.
>
> Each day's broadcasting shall constitute a separate offense.

"Radio" broadcasting in this context includes television broadcasting. See 47 U.S.C. §153(b) (1982); Allen B. Dumont Laboratories v. Carroll, 184 F.2d 153 (3rd Cir. 1950), cert. denied, 340 U.S. 929 (1951).

The San Antonio Court of Civil Appeals in State v. Socony Mobil Oil Company, 386 S.W.2d 169 (Tex. Civ. App. - San Antonio 1964, writ ref'd n.r.e.), citing 18 U.S.C. §1304, considered whether an injunction could be granted prohibiting the broadcast of a "TV-Bingo" game. The court concluded that even if the bingo-format promotional scheme at issue there was a "lottery" under Texas law, the state had no jurisdiction to enjoin the broadcast because Congress had "preempted the field of regulating the broadcasting of [it] over TV." 386 S.W.2d at 174.

The Socony Mobil holding would be in point if a promotional game with a bingo format were a "lottery, gift enterprise, or similar scheme" within the meaning of the federal statute whether or not a person who participates as a player furnishes something of value for the opportunity to participate. However, the federal statute does not reach "give away" programs. Federal Communications Commission v. American Broadcasting Company, 347 U.S. 284 (1954); Caples Co. v. United States, 243 F.2d 232 (D.C. Cir. 1957).

The precise act prohibited by section 1304 of Title 18 is the broadcasting of prohibited information or knowingly permitting its broadcast (by one operating a station). It was held in Federal Communications Commission v. American Broadcasting Company, supra, that "give away programs" requiring no movement of consideration from the participant were not lotteries, gift enterprises, or similar schemes within the meaning of section 1304. In part, the Supreme Court based its conclusion on a long standing administrative interpretation (by the Post Office Department) of the same language found in section 1302 of Title 18, which prevents the mailing of lottery tickets and related matters. Cf. Post Publishing Co. v. Murray, 230 F. 773 (1st Cir. 1916).

Thus, federal law does not punish the use of the mails or broadcasting facilities to conduct, promote or administer a bingo game if the person who participates as a player does not furnish something of value for the opportunity to participate. But the Texas Bingo Enabling Act does. Unless Congress has preempted the entire field of

criminal laws relating to lotteries or "give away" promotions, the Texas law is enforceable. We do not believe it was the intent of Congress in enacting sections 1302 and 1304 to occupy the field of criminal law with respect to lotteries or "give away" schemes. Those statutes, in our opinion, do not preempt the operation of a state criminal law that reaches conduct nowhere addressed by a federal statute. Cf. United States v. Fesler, 781 F.2d 384 (5th Cir. 1986).

In Head v. New Mexico Board of Examiners in Optometry, 374 U.S. 424 (1963), the United States Supreme Court rejected a claim that a state restriction on radio advertising of optometry prices was invalid because, supposedly, the enactment of the Federal Communications Act preempted the field. Mr. Justice Brennan, concurring, said:

> The New Mexico law is one designed principally to protect the state's consumers against a local evil by local application to forbid certain forms of advertising in all mass media. Such legislation, whether concerned with the health and safety of consumers, or with their protection against fraud and deception, embodies a traditional state interest of the sort which our decisions have consistently respected. (Citation omitted.) Nor is such legislation required to yield simply because it may in some degree restrict the activities of one who holds a federal license.

374 U.S. at 445. We believe the Texas ban on unlicensed bingo games presents an analogous situation.[1] Cf. Attorney General Opinion MW-488 (1982).

The policy and scope of section 1304 was considered by the Second Circuit in 1969, a few years after the Head case was decided. In New York State Broadcasters Assn. v. United States, 414 F.2d 990 (2d Cir. 1969), the court held that section 1304 applies to the television broadcast of prohibited information about legal, state-sponsored lotteries as well as illegal ones. In determining the scope of the congressional enactment, the court stated:

---

1. While sections 1304 and 1302 might preempt a state law which attempted to penalize the broadcast of the same lottery information condemned by the federal law, or which attempted to penalize the mailing of such lottery information, they do not preempt a state law that would prevent the production of the material which, if it were produced, might then be broadcast or mailed. Cf. Brooklyn Daily Eagle v. Voorhies, 181 F. 579 (E.D.N.Y. Cir. 1910).

> In prohibiting the broadcasting of lottery information Congress was not acting in a vacuum; for more than one hundred years a prohibition on conducting a lottery by use of the mail facilities had existed. <u>See</u> 18 U.S.C. §§1302, 1303. Similarly, prohibitions on importation and interstate shipment of lottery material also existed when section 1304 was enacted. <u>See</u> 18 U.S.C. §1301. <u>It is true that Congress has not attempted to prohibit the conduct of lotteries; with narrowly prescribed exceptions the states have done that.</u> But Congress has exercised its power -- the existence of which petitioners concede -- to inhibit lotteries <u>and to aid the states</u> by denying lottery promoters access to facilities over which the federal government has control.
>
> <u>It is in this light that the Commission's action must be considered -- not as an exercise of the power to regulate broadcasting in the public interest necessitated by the nature and technology of broadcasting, but as enforcement of the clear congressional policy embodied in section 1304.</u> (Emphasis added).

414 U.S. at 995.

The policy of the federal statute is to prohibit (in aid of the states) the broadcast of certain types of information; it is not one <u>promoting</u> the broadcast of whatever has not been specifically prohibited by federal law.[2] The operation of state law to prevent the broadcast of "give away" programs is not at odds with any federal policy favoring such broadcasts. As the United States Supreme Court noted in <u>Exxon Corp. v. Governor of Maryland</u>, 437 U.S. 117 (1978), a "conflict" found only in the possibility that a state statute would

---

2. The scope of section 1304 was further restricted by the Third Circuit in <u>New Jersey State Lottery Commission v. United States</u>, 491 F.2d 219 (3rd Cir. 1974), another case involving a state-sponsored lottery. Certiorari was granted by the Supreme Court in order to resolve the conflict created but the cause was remanded to determine mootness in the light of section 1307 of Title 18 (making section 1304 inapplicable to information about state-conducted lotteries), subsequently enacted. <u>United States v. New Jersey State Lottery Commission</u>, 420 U.S. 371 (1975).

prevent an act that a federal statute would otherwise "permit" (but not protect as a policy matter) is not sufficient to warrant preemption. 437 U.S. at 131. Cf. King v. Gemini Food Services, Inc., 438 F. Supp. 964 (E.D. Va. 1976), aff'd per curiam, 562 F.2d 297 (4th Cir. 1977) (adopting district court's reasoning), cert. denied, 434 U.S. 1065 (1978); Vincent v. General Dynamics Corp., 427 F. Supp. 786 (N.D. Tex. 1977). In our opinion the Bingo Enabling Act is not preempted by federal law.

## S U M M A R Y

The conduct, promotion, or administration of an unlicensed game in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random is illegal unless expressly excepted by the Texas Bingo Enabling Act, including, for example, games conducted, promoted, or administered by local newspapers and television stations even though persons who participate as players furnish nothing of value for the opportunity to participate.

Very truly yours,

JIM MATTOX
Attorney General of Texas

JACK HIGHTOWER
First Assistant Attorney General

MARY KELLER
Executive Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Bruce Youngblood
Assistant Attorney General