No. 33,026

THE STATE OF KANSAS, ex rel. CLARENCE V. BECK, Attorney General, *Plaintiff*, v. THE FOX KANSAS THEATRE COMPANY, *Defendant*.

Opinion filed December 12, 1936.

*Clarence V. Beck,* attorney general, *Morton B. Cole,* assistant attorney general, for the plaintiff; *F. E. Williams,* of St. Louis, Mo., of counsel.

*Roland Boynton,* of Topeka, for the defendant; *Emmett Thurmon,* of Denver, Colo., and *S. P. Halpern,* of Minneapolis, Minn., of counsel.

The opinion of the court was delivered by

HUTCHISON, J.: This is an original proceeding in quo warranto brought in the name of the state of Kansas on relation of the attorney general of the state, to oust and enjoin the Fox Kansas Theatre Company, as a corporation, from exercising or doing business within the state of Kansas because of the misuse and abuse of franchises, privileges and authority conferred upon it by the laws of the state of Kansas, in that it conducted, operated, managed and superintended at its theaters, and particularly at the one in the city of Fort Scott, on February 26, 1936, a lottery, gift enterprise, policy or scheme in the nature of a lottery, advertised and commonly known as "bank night."

The first six paragraphs of the amended petition describe the parties to the action, the plaintiff in its official capacity and the defendant in its corporate capacity, and then devotes the last four paragraphs to describing the method and way of conducting the "bank night" plan, concluding that such conduct was not within the corporate privileges of the defendant, that it was in violation of the laws of Kansas and was a great harm and injury to the general public and the state of Kansas. The defendant in its answer admits the allegations of the first six paragraphs of the amended petition, but denies all the other allegations thereof, and then pleaded at length a defense of its operation of "bank night" and that it is not in any way or manner violating any of the laws of the state or exceeding its corporate privileges.

The plaintiff then moved the court for judgment for plaintiff on the pleadings for the reason that they show plaintiff to be entitled to the relief for which it prayed. Under such motion the exact language of the amended petition is not of particular importance, the nature of the plaintiff's claim having been heretofore briefly stated, but the language and grounds of the defense are especially important in meeting the allegations of the amended petition, so the entire answer, except a few formal portions, is here set out, and is as follows:

"1. It denies each and every material allegation contained in plaintiff's amended petition except those which are hereinafter specifically admitted."

"3. Defendant specifically denied that it has been and now is doing acts in the state of Kansas which amount to a surrender and forfeiture of its rights and privileges as a corporation within the state of Kansas, and that it is now abusing its powers and exercising powers not conferred on it by the laws of the state of Kansas.

"4. Defendant specifically denies that it is now conducting through its agents, and that it did on or about the 26th day of February, 1936, advertise, in violation of the provisions of R. S. 21-1501, by sundry means of advertising, a lottery, gift enterprise, policy, or scheme in the nature of a lottery, at the Liberty Theater in the city of Fort Scott, or at any other theater, and specifically denies that it has at any time, or at any place, conducted, operated, managed, or superintended a lottery, gift enterprise, policy, or scheme in the nature of a lottery.

"5. The Affiliated Enterprises, Inc., of the state of Colorado, is the owner of a plan or system known as 'bank night,' which plan is a method of orderly procedure, process, or plan of advertising formulated, contrived, and devised to stimulate interest in the motion-picture industry, and for which application for United States patents has been filed, and the special registers, numbered pads, record books, instructions, contracts and literature pertaining thereto have been copyrighted and the name trade-marked; that said trade-mark has been registered in the office of the secretary of state of the state of Kansas."

"7. The defendant has entered into a contract with the Affiliated Enterprises, Inc., whereby said defendant has been licensed to operate the plan of 'bank night' in connection with its motion-picture theaters in the state of Kansas; that printed on such license contract, and as a part thereof, is contained the following notice:

#### 'SPECIAL NOTICE

" 'BANK NIGHT is an advertising plan designated to stimulate public interest in the motion-picture industry and in your theater. It is not intended to provide a means whereby you can give a prize to your patrons. You, therefore, are instructed to follow the copyright instructions below implicitly, particularly those pertaining to the awarding of the bank account. The name of the winner must be announced outside your theater and if the winner is outside the theater, he must be permitted to enter and claim the bank account without any admission fee. All persons must be allowed to register without payment of an admission fee. You must give public notice of the above. Affiliated Enterprises, Inc., will cancel your license immediately upon receipt of information that you have departed from said instructions in any manner.'

"8. The defendant operates the Liberty Theater in the city of Fort Scott, Kan., as well as motion-picture theaters in other towns in the state of Kansas; that at said theaters said defendant has operated the plan of 'bank night' under its license with the Affiliated Enterprises, Inc., in full compliance with the copyrighted plan and the terms of the license contract, in the following manner:

"In a special copyrighted register, hereinafter known as register No. 1, persons over the age of sixteen register, free, by signing their respective names

and setting forth their addresses, and opposite each name is a number, in regular order from one up. A special copyrighted register No. 2 is provided, in which defendant places, in alphabetical order, the names from the special register No. 1, and opposite each respective name the number corresponding to the number opposite the respective name in special register No. 1. The plan of registration and transferring of the names from special register No. 1 to register No. 2 eliminates any duplicate registration, and affords a convenient method of finding the name and address of the lucky person at the time of the drawing. The said special register No. 1 is placed about or near the entrance or exit of defendant's theater, or at some other place convenient or satisfactory to the defendant, and so the public may conveniently register without buying a ticket. Each person when registering places the prefix 'Mr.,' 'Mrs.,' or 'Miss' before the name in order to designate whether the person is single, married, male or female. No person, during the particular period wherein the system is in use, at any place, is required or allowed to register more than once.

"A bank is chosen by the defendant, as a part of the plan, wherein a certain designated amount of money is deposited for each selected period by the defendant, for the use or benefit of designated persons hereinafter mentioned. The name of said bank is exhibited over the special register No. 1. It is distinctly provided that no additional sum or compensation shall be added to the regular admission to said place of amusement or entertainment by reason thereof, and that registration and the purchase of the tickets shall be entirely separate and apart and have no connection with each other; that no person is required to buy a ticket before registering, and the mere fact of buying a ticket does not entitle the holder thereof to participate in the award unless he voluntarily registers in special register No. 1; that the purpose of the plan is for advertising only and in no event is anyone required to pay anything for registration, and the registration is open and free to all alike.

"At a certain time or times fixed by the defendant the numbers corresponding to those set opposite the names in the special register No. 1 are placed into a box or container, from which is chosen one number by some person other than one connected with the theater; and in the event the person whose name is written in special register No. 1 opposite the number so chosen or selected shall be present in that particular theater or place of amusement, in the lobby, on the outside, or wherever he may be, provided that he appears and identifies himself within a reasonable time after the drawing, such person is entitled to the award; that such person may go into the theater and identify himself and claim the award without the purchase of a ticket of admission or the payment of or doing anything of value. The reason that it is required that the person call at the theater and identify himself in a reasonable time to be entitled to the award is to avoid the possibility of people registering, leaving the city and changing their addresses, and the theater being unable to locate the party and the public thereby feeling that the drawing wasn't on the square. In the event such award shall not be claimed in the said manner, then the amount is added to a like amount for the next week and continues to accumulate until someone, in the manner herein stated, shall be entitled to the said award. Public notice is given of these facts and the license for the use of said plan may be canceled for failure to comply with the said terms.

"The plan is used only as a means of advertising, and the said bank account is a free and unrestricted donation by the defendant, and the amount thus to be awarded is deposited in the designated bank prior to the drawing, and to and on account of the winner thereof, subject to the terms and conditions herein mentioned; that the participants do not pay, contribute or donate in any way, directly or indirectly to said bank account.

"9. At no time has said defendant made any charge or required the registrant to give anything of value for the privilege of registration or participation in the plan. The purchase of a ticket of admission to theaters operated by the defendants has not been and is not a condition to registration or participation, nor does the purchase of a ticket of admission entitle the patron to participate in the plan.

"10. The plan of 'bank night,' like other forms of advertising, is designed to create public interest in the theaters of its licensee, and thereby to increase gross receipts from paid admissions, not only on the nights of its actual operation, but on all other nights of the week, and it has had this effect in connection with defendant's theaters.

"11. The plan is not designed or intended to cause any member of the public to lose or to risk any money or other thing of value.

"12. On the nights when the plan of 'bank night' has been operated by defendant in its various theaters, there have been some people outside the theaters waiting for the announcement of the award, and in the practical operation of this plan by defendant it has sometimes occurred that the award of the 'bank night' has been made by the defendant to persons who had registered in the manner above described, but who had not purchased tickets of admission or paid any money, either directly or indirectly, and were not in the theater at the time of the drawing, and who were admitted to the theater without charge to claim the award.

"13. On the nights when the plan of 'bank night' has been operated by defendant in its various theaters some persons have purchased tickets of admission to the theaters who have not registered in the 'bank night' register, and who, for that reason, were not qualified to participate in the operation of the plan.

"14. The number of names on the registration book varies according to the towns and theaters, but at the Liberty Theater in the city of Fort Scott the registration book contained approximately 5,000 names.

"15. Defendant specifically denies that 'bank night,' as above described, constitutes a lottery, gift enterprise, policy or scheme in the nature of a lottery.

"16. Defendant specifically denies that by the operation of the plan of 'bank night' it has misused and abused its franchises, privileges and authority conferred upon it by the laws of the state of Kansas, and specifically denies that the operation of the plan of 'bank night' has been a great harm and injury to the public, and a perversion and misuser of the franchises granted to it by the state of Kansas, and denies that it is a usurpation of franchises and privileges not granted by the state of Kansas.

"Wherefore, defendant prays that plaintiff's prayer that defendant be ousted, restrained and enjoined from doing business as a corporation within the state of Kansas be denied, and that the costs of this action be taxed to the plaintiff."

Our constitution prohibits lotteries in the following language:

"Lotteries and the sale of lottery tickets are forever prohibited." (Art. 15; § 3.)

Kansas, like most states, has a description and definition of a lottery in its criminal code. R. S. 21-1501 is as follows:

". . . making, establishing or promoting any lottery, gift enterprise, policy or scheme of drawing in the nature of a lottery, in this state, or shall knowingly advertise or make public, or cause to be advertised or made public in any manner any lottery, gift enterprise, policy or scheme in the nature of a lottery. . . ."

R. S. 21-1506 is as follows:

"The term 'lottery' as used in this act, includes schemes for the distribution of money or property among persons who have given or agreed to give a valuable consideration for the chance, whether called a lottery, raffle, or gift enterprise, or by some other name."

Our statute differs from some others in the use of the words "given or agreed to give," whereas other statutes read "paid or agreed to pay."

While the main question here involved is whether or not "bank night," as described by the defendant, is a lottery, it will also be observed that the statutes above quoted apparently go further and include "gift enterprises, policy or scheme in the nature of a lottery," which might include something that, strictly speaking, was not a lottery or did not have all of its usual features or elements, but so closely resembled it as to be described as being in the nature of a lottery. Other sections of the criminal code relate to the sale of lottery tickets, but we are not concerned with that question in this action.

Again, while we go to the criminal code for a description and definition of a lottery, this is a civil action, and it is regularly recognized that there may be a difference in the construction of statutes for different purposes so that laws enacted in the interest of public welfare and providing remedies against either public or private wrongs should be liberally construed, while all statutes of a penal nature must be construed strictly in favor of those whom they affect. (59 C. J. 1105.) Along this line the following from 38 C. J. 305 is quite applicable:

". . . statutes prohibiting or regulating lotteries should be construed with a view to remedying the mischief intended to be prevented, and to suppress all evasions for the continuance of the mischief. Therefore, where the question presented is one of enforcing criminal responsibility, or of refusing to aid in a transaction alleged to be within the statutory prohibition, the courts will

ordinarily construe liberally the provisions relating to lotteries so as to include all schemes which appeal to the gambling propensities of men."

Many definitions of the term "lottery" from standard legal works are cited and quoted in the briefs, but we think our code, in attempting to define the term and describe the things it includes, should be accepted for a definition in this state, at least in so far as it attempts to define or describe it. Both parties in this case agree that there are three necessary elements in a lottery, namely, a prize, a chance, and a consideration. They also both agree that there is no question in this case as to the "bank night" plan having in it the first two elements of prize and chance—that is, the offering of a prize and the distribution of the prizes by chance, but they differ seriously as to the third element of consideration.

The plaintiff contends that the defendant corporation in the operation of "bank night" in its theaters in the state of Kansas has been and is now conducting a lottery, gift enterprise, policy or scheme in the nature of a lottery in violation of the provisions of R. S. 21-1501, and is therefore engaged in doing acts in the state of Kansas which is an abuse of its powers and privileges under its charter and justifies a surrender or forfeiture of its rights and privileges to engage in business in the state of Kansas. It would be idle to attempt to harmonize the numerous opinions cited on the question at issue in this case. Some of them are diametrically opposed to each other, not in two distinct lines but in varying details leading to opposite conclusions on the question of consideration of a lottery or gift enterprise in the nature of a lottery, so we shall cite and consider some of them on both sides and draw therefrom the best conclusion we can as appropriate to the facts and pleadings in the case at bar.

It is urged by the plaintiff that the answer admits that the design of the "bank night" plan is to create public interest in the theaters and thereby to increase gross receipts from paid admissions and that the plan has had that effect, and therefore the increased paid admissions is a consideration in itself from which the company can afford to set aside the necessary funds for the prizes. These are the only receipts which come into the hands of the defendant company in the operation of this plan. Defendant insists that these entire receipts are for the theater entertainment and not a penny of it is for the chance afforded those of the theater patrons who register. This does not seem to be a very consistent position,

that there is no consideration for the chance paid by any one and yet the plan increases the gross receipts.

Can it be possible that this intricate plan and proceeding was invented to evade a danger point? Why pursue this long and circuitous route of registering and other requirements if the money paid by the attendant was not a consideration? Defendant cites cases where it is held that neither admission money, nor any part of it, is a consideration for the chance, but they are not persuasive under the circumstances.

It was said in *Brooklyn Daily Eagle v. Voorhies*, 181 Fed. 579, that—

"The question of consideration does not mean that pay shall be directly given for the right to compete. It is only necessary that the person entering the competition shall do something or give up some right. The acquisition and sending in of labels is sufficient to comply with that requirement. Nor does the benefit to the person offering the prize need to be directly dependent upon the furnishing of a consideration. Advertising and the sales resulting thereby, based upon a desire to get something for nothing, are amply sufficient as a motive." (p. 581.)

This state years ago considered a similar question, and held in a criminal case that the sale of the merchandise, even at the usual price, included the purchase price of tickets to a chance adventure advertised by the merchant. The following is the syllabus in *Davenport v. City of Ottawa*, 54 Kan. 711, 39 Pac. 708:

"The defendant was a partner in the firm of D. L. & Co., operating a large dry-goods store in the city of Ottawa. Said firm placed in its window a locked box, with a glass front, containing $25 in bills, and advertised that all persons buying goods in their store, and paying therefor 50 cents or more, would be given a key, and one and only one key would be given out which would unlock the box; that the person receiving the key which would unlock the box would be given the $25 from it. The defendant sold goods at the usual and ordinary prices, without extra charge, on account of said key, to divers persons, for 50 cents and more, and gave to each of said persons a key, to which was attached a card stating, in substance, the above offer. *Held,* that such transactions were in effect sales of merchandise and lottery tickets for an aggregate price, and that a conviction therefor under a city ordinance was right." (Syl.)

It is further argued in support of the "bank night" plan that inasmuch as a quantity of people were permitted the privileges of the chance the same as those who attended the theater and registered and were paying nothing for that privilege, that the plan lacked the necessary element of consideration. Reference in that connection is made to the criminal case of *State v. Eames*, (N. H.) 183 Atl. 590,

which was a "bank night" case, and it was held that the registration plan was not the pay required by the statute to bring the enterprise under the terms of a lottery. In the opinion it went to the extent of apportioning under the law the number of those who paid and those who did not pay, as follows:

"Violation is shown only when, regardless of the subtlety of the device employed, the state can prove that, as a matter of fact, the scheme in actual operation results in the payment, in the great majority of cases, of something of value for the opportunity to participate." (p. 592.)

Another criminal case, decided in the state of Washington, held differently concerning the distribution of tickets at a moving-picture theater one night each week, which entitled them to participate in the distribution of groceries and other personal property by lot and chance, and the conviction of the operator was sustained in the supreme court. In the opinion the following was stated:

"If in the flourishing days of the Louisiana lottery its management had advertised that it would give a free ticket to the president of every bank in the city of New Orleans, that would not have changed the scheme from a lottery, whether or not any one or all of such free tickets were accepted." (*State v. Danz,* 140 Wash. 546, 548, 250 Pac. 37.)

A rather early case on this subject is *Yellow-Stone Kit v. The State,* 88 Ala. 196, 7 So. 338, where it was held that a conviction could not be maintained where the defendant publicly distributed a few prizes among a large number of ticket holders, unless it was also shown that a valuable consideration was paid for the tickets, either directly or indirectly. These tickets were distributed gratuitously at the exhibitions or performances among those who attended the meetings, no charge being made for admission, but a charge for the limited number of seats was made. Between the exhibition and entertainments of different kinds the defendant sold his medicines and the holders of tickets were not required to be present at the drawing.

A very different conclusion was reached in the English case in 1907, 1 K. B. 448, where a newspaper distributed to the public medals upon which there was later a selection of winning numbers by lot and published in the newspaper. It was not necessary for the holder of the medal to be a purchaser of the newspaper. The objection to the scheme was that it induced persons to buy the paper and increased its circulation, and it was held:

". . . that, although it was possible for an individual holder of a medal to obtain a prize without paying anything for his chance, the medal holders as

a body collectively contributed sums of money to the fund out of which the money came for the prizes, and that the scheme was a lottery within s. 2 of the Gaming Act, 1802." (*Willis v. Young and Stembridge*, 1 K.B., 448.)

On the question of a part of the admission fee being regarded as a partial consideration for the lottery chance, such was the holding in a criminal case in Missouri, being *State v. Mumford*, 73 Mo. 647, the syllabus of which is as follows:

"The proprietors of a newspaper, in pursuance of a prearranged and advertised scheme, issued to each subscriber for their paper, in addition to the paper itself, and without extra charge, a ticket which entitled the holder to participate in a distribution of prizes offered by the proprietors to all persons who should become subscribers. The distribution was made by lot. *Held*, that the scheme was a lottery within the purview of the criminal laws; and it made no difference that the tickets were not sold, but were given to subscribers and to no one else."

Iowa is one of the states that does not have a definite statute describing and defining lottery, and therefore resort is necessarily had in that state to the general definitions thereof. Two recent cases, both involving the question of the "bank night" plan, reached different conclusions in that state. In the one in federal court, which was an injunction suit to restrain and enjoin parties from interfering with the operation of the plaintiff theater corporation in the exercise and use of the "bank night" plan, it was held by the federal district court of the southern district of Iowa in that case:

"If plan of operating 'bank night' as conducted in motion-picture theater was to deduct a certain percentage from admission charge to theater and use such percentage to pay or offset loss which might be occasioned by the prize, operation of 'bank night' would constitute conducting a lottery.

"That persons attending theater on 'bank night' because of interest in winning a prize and not because of motion picture were few in comparison to whole number of audience would not prevent operation of 'bank night' from constituting the conducting of a lottery.

"Conducting in motion-picture theater of advertising scheme called 'bank night' held to appeal to cupidity of public and spirit of gambling and speculation, to be unfair and contrary to public safety, and to so closely border on conducting of a lottery as not to entitle theater corporation to injunction to restrain interference with operation of scheme." (*Central States Theater Corporation v. Patz*, 11 F. Supp. 566, headnote ¶¶ 5, 6, 8.)

A few months later the supreme court of the state of Iowa, in a criminal case appealed from conviction in the district court, held the defendant not guilty of conducting a lottery under the "bank night" plan. The case is *State v. Hundling*, 220 Iowa, 1369, 264 N.W. 608, and the syllabus is as follows:

"A scheme for the distribution by lot or chance, of valuable prizes does not constitute a lottery when the recipient of the prize neither pays nor hazards anything of value for the chance to obtain said prize. And it is quite immaterial that the donor of such prizes expects such distribution of prizes will work a financial betterment of his business."

The case of *Maughs v. Porter*, 157 Va. 415, 161 S. E. 242, is one that has in it an extreme instance of the feature of consideration. It was where an auctioneer advertised that every person attending the auction sale would have an equal chance for the drawing of a prize of a new Ford automobile, regardless of buying or bidding at the sale. The plaintiff, a woman, attended the auction, and when the tickets were passed received one. At the time the drawing was made she was the lucky person, and when the auctioneer refused to comply with his promise she brought this action against him, and the court held that there was sufficient consideration to enforce the contract except that it being a lottery, was illegal. One part of the syllabus is as follows:

"Held: That the attendance of the plaintiff at the sale was a sufficient consideration for the promise to give an automobile, and could be enforced if otherwise legal." (Syl. ¶ 2.)

The case of *General Theatres v. Metro-Goldwyn-Mayer D. Corp.*, 9 F. Supp. 546, being one decided in the federal district court of Colorado recently, is cited and discussed by both parties to this case, and while it is not a "bank night" case nor a criminal case, but one in equity, it discusses the use of prizes at theaters as an advertising plan and the effect of it between theaters and moving-picture distributors. It also involves a question under the National Industrial Recovery Act, which has since been held unconstitutional. In this case the court found that the plaintiff theaters were not entitled to an injunction restraining the moving-picture distributors from advertising the theaters where their films were used by giving away an automobile each week under the plan of chance drawings. The fourth paragraph of the headnote of this decision is particularly pertinent to the matter under consideration as showing the distinction between the construction of a statute for criminal or civil purposes. It is as follows:

"Practices which bar complainant from equitable relief need not be such as would subject him to criminal prosecution, or actually fraudulent, or constitute the basis of legal action."

In an earlier case in Colorado, *Cross v. The People, etc.*, 18 Colo. 321, 32 Pac. 821, which was a criminal action on a charge of con-

ducting a lottery, the judgment of conviction in the lower court was reversed because of lack of consideration, but in the opinion the following statement was made:

"The gratuitous distribution of property by lot or chance, if not resorted to as a device to evade the law, and no consideration is derived directly or indirectly from the party receiving the chance, does not constitute the offense. In such case the party receiving the chance is not induced to hazard money with the hope of obtaining a larger value, or to part with his money at all; and the spirit of gambling is in no way cultivated or stimulated, which is the essential evil of lotteries, and which our statute is enacted to prevent." (p. 324.)

One cannot read these two Colorado decisions without being impressed with the two features mentioned in the quotations above made, namely, the difference in the construction of a statute for civil and criminal purposes, the former being a liberal one and the latter a strict construction, and the feature of evasion which is more or less apparent in resorting to such a complicated scheme as is developed in the "bank night" plan and for which plan a copyright has been procured from the proper officers at Washington and the privilege of using the plan or the license, as it is called, is being sold to theater owners.

The case of *State, ex rel., v. Fair Association*, 89 Kan. 238, 131 Pac. 626, while not treating of the question of consideration, directly made the following ruling in a quo warranto case against a fair association with reference to pool selling and bookmaking:

"The state which gave such an association its 'corporate' life may require it to refrain from conduct clearly against good morals and which ordinarily constitutes a crime; and such association cannot demand that the courts enter upon a critical examination of the effect and validity of statutes passed for the general purpose of suppressing gambling in order to remove the seal of condemnation." (Syl. ¶ 3.)

In the case of *Glover v. Malloska*, 238 Mich. 216, 213 N. W. 107, it was held that the scheme of a wholesale oil company in selling tickets to its customers to be given away by them to their customers and others, entitling them to a chance at the drawing for an automobile once a month was clearly a lottery scheme under the statute of that state and an injustice to competitors in the oil business which should be enjoined by the court in an equity proceeding.

A very similar case was that of *Featherstone v. Independent Service Station Assn.*, 10 S. W. 2d (Tex.) 124, where the project was very similar to the "bank night" plan, it being an injunction case. It was held not to be a violation of the lottery statute of Texas.

In the case of *Sproat-Temple Theater Corp. et al. v. Colonial Theatrical Enterprise, Inc., et al.*, (Mich.) 267 N. W. 602, which was an injunction action against the owners to restrain and enjoin the practice of what the plaintiff called a lottery in giving tickets without extra charge to all attendants, they being limited to attendants in this particular case, and the court held it was an unfair practice, but particularly applicable to this case the court said:

"But while the patrons may not pay, and the respondents may not receive any direct consideration, there is an indirect consideration paid and received. The fact that prizes of more or less value are to be distributed will attract persons to the theaters who would not otherwise attend. In this manner those obtaining prizes pay consideration for them, and the theaters reap a direct financial benefit." (p. 603.) (See, also, *Affiliated Enterprises v. Grantz*, 86 F. 2d 597.)

In the case of *People v. Cardas*, 137 Cal. App. 788, 28 P. 2d 99, which was a criminal case in a project quite similar to the "bank night" plan, the court held that—

". . . it being unnecessary to buy an admission ticket to secure a prize ticket, or to claim the prize, the holders of said tickets did not pay any valuable consideration for the chance of winning a prize, or hazard anything of value upon such chance, the scheme was not a lottery, and the operator was not guilty of drawing a lottery or of disposing of lottery tickets in violation of sections 320 and 321 of the Penal Code." (Syl. ¶ 2.)

In the case of *Commonwealth v. Wall* (Mass.), 3 N. E. 2d 28, which was also a criminal action involving the "bank night" project and plan, a similar holding was reached, particularly on the question of there being no consideration.

In *People v. Shafer*, 289 N. Y. Supp. 649, which was a "bank night" case, the same as this except it was a criminal case, it was held:

"Motion-picture theater manager, who conducted 'bank night' scheme whereby cash prize was given to person whose name was drawn from list of registrants and who appeared in theater to claim prize within five minutes, *held* not guilty of offering property for disposal dependent upon drawing of 'lottery' where neither registrants nor winners were required to purchase admission tickets." (Syl. ¶ 2.)

*State v. Crescent Amusement Co.*, (Tenn.) 95 S. W. 2d 310, was a "bank night" case—not a criminal one, but an action for injunction, and the court held the project did not embrace all the essentials of a lottery.

As stated before, it is impossible to harmonize all these decisions. Our statute describing and defining lotteries, being more inclusive

than some of those of other states or some of the general definitions given or cited, we conclude that in a civil action of quo warranto, where a more liberal construction is proper to be made than in a criminal action, the indirect benefit derived by the defendant under the "bank night" plan in the way of increased gross receipts from paid admissions, as set out in paragraph 10 of the answer, is sufficient consideration coming directly or indirectly from those entitled to the chances generally to meet the requirements as to that necessary element in a policy or scheme of drawing in the nature of a lottery. Besides, we cannot escape the impression from the intricate and complicated outline of the "bank night" plan, as set out in the answer, and said to have been recognized by the government of the United States as deserving of a copyright and trade-mark, that it is in effect a plan to evade the constitutional and statutory provisions of this state as to lotteries. We therefore conclude that the answer of the defendant is not a sufficient defense to the prayer of the plaintiff for ouster, and that the motion of the plaintiff for judgment on the pleadings should be sustained.

It is therefore ordered that the defendant be ousted from the exercise of the corporate power of operating the so-called "bank night" device complained of, and it is likewise ousted, prohibited, restrained and enjoined from operating or conducting any scheme or device of like character within the state of Kansas.