## No. 39,706

STATE, ex rel. WARNER MOORE, County Attorney of Sedgwick County, By KEITH SANBORN, Deputy County Attorney of Sedgwick County, Kansas, *Appellant,* v. AL M. BISSING, and THE WICHITA GREYHOUND CLUB, and all Agents, Servants and Employees of Each of Them, *Appellees.*

(283 P. 2d 418)

Opinion filed May 7, 1955.

*Keith Sanborn,* Deputy County Attorney, and *Robert E. Hoffman,* Assistant Attorney General, argued the cause, and *Harold R. Fatzer,* Attorney General, and *Warner Moore,* County Attorney, were with him on the briefs for the appellant.

*Clyde Wendelken,* of Wichita, argued the cause, and *W. A. Kahrs,* of Wichita, was with him on the briefs for the appellees.

*Payne H. Ratner, Louise Mattox, Payne H. Ratner, Jr., Russell Cranmer, Dale B. Stinson, Jr., Carroll F. Pope, Keith Eales, Cliff W. Ratner, William L. Fry* and *A. Wayne Murphy,* all of Wichita, filed a brief *amicus curiae* in behalf of Kansas Greyhound Breeders Educational Association, Inc.

The opinion of the court was delivered by

PRICE, J.: The basic question in this case is whether a system of pari-mutuel betting operations on dog races constitutes a lottery, in violation of the Constitution of this state.

For reasons which will hereinafter appear, the court holds that it does.

The action was brought by the state, upon the relation of the county attorney of Sedgwick County, to enjoin further operation of the enterprise in question and to declare the premises a common nuisance, as being in violation of Article 15, Section 3, of our Constitution, which reads·

"Lotteries and the sale of lottery tickets are forever prohibited."

There is no dispute concerning the facts, and they may be stated as follow:

Defendant, Al M. Bissing, is the owner of a tract of land adjacent to the city of Wichita. In the summer of 1954 he, as owner and operator of the Wichita Greyhound Club, commenced operating dog races on a race track on the property. It was enclosed by a woven wire fence. An admission charge of fifty cents was made to persons attending. "Post time" was 7:45 P. M., and official "programs" could be purchased for twenty-five cents. These programs listed the various races for the evening and supplied data and factual information concerning each dog to be entered in a particular race. The programs also contained the following information and instructions to the patrons:

"WINDOWS CLOSE WHEN DOGS REACH THE BOX
"BUY YOUR TICKETS EARLY                    DON'T BE SHUT OUT

### "ATTENTION

"The Judges, in determining the places of the dogs at the finish of a race, shall consider only the relative position of the respective noses of such dogs.

"There can be no refund after the dogs have entered the starting box for failure to leave, or for any other unforeseen accident, unless failure to start is due to mechanical defect.

"If any mishap occurs during the running of a race due to the fault of mechanical devices, it will be run over or declared off at the discretion of the Presiding Judge.

### "NOTICE

"A dog is a starter for a race when it has left the paddock for the post. A dog, after leaving the paddock for the post, may be excused by the Judges in case of accident or casualty, but only a case where they consider such dog crippled, disabled, or unfit to run.

### "JUDGES' DECISION FINAL

"The Presiding Judge and his associates, are the Official arbiters of every race, and their decisions are final.

### "NOTICE TO PUBLIC

"If a race is marred by jams, spills or racing circumstances other than accidents to the machinery, while a race is being run, and three or more dogs finish, the Judges shall declare the race finished, but if less than three dogs finish, the Judges shall declare it 'No Race' and monies shall be refunded.

"No race shall be called official unless the lure is in advance of the dogs at all times during the race, and if at any time during the race any dog or dogs catch or pass the lure, the Judges shall declare it 'No Race' and all monies shall be refunded. The lure shall be operated consistently.

"If a dog bolts the course, it shall forfeit all rights in the race, and no matter where it finishes, the Judges shall declare the race the same as if it were not a contender.

## "IMPORTANT NOTICE

"Positively no tickets will be sold after the dogs have reached the starting boxes. Torn or mutilated tickets will not be accepted unless presented at Window within 30 minutes after the race is run. Claims for lost or destroyed tickets must be made at Window within 30 minutes after race is run.

"Post position corresponds with the number on program.

"Races always are run as scheduled. A dog is a starter for a race when it has left the paddock for the post. Races will be run every night.

## "FIVE MINUTE WARNING

"Five minutes before each post time, a warning will be announced advising that windows will be closed in five minutes.

## "NOTICE

"All wagering at The Wichita Greyhound Club must be done at mutuel windows. Those who do otherwise are subject to arrest and prosecution by law. Touting is strictly prohibited on the premises and the management reserves the right to expel any person whose presence is deemed objectionable.

"The Announcer will give all information of changes and assist our patrons in every posible manners.

"PLEASE BE CAREFUL about holding your mutuel tickets until after the Official result of the race has been posted. No claim for winning tickets thrown away, torn or mutilated, will be recognized unless presented to Window within 30 minutes after the race.

## "WHAT EVERY FAN SHOULD KNOW ABOUT DOG RACING

"In welcoming you to the greyhound races, The Wichita Greyhound Club offers for your approval what it sincerely believes is the fairest and cleanest wagering sport in existence.

"The states of Florida and Massachusetts are the recognized greyhound racing centers in the United States, but the sport has spread in recent years to include Oregon, Montana, North Carolina, Colorado, Arizona, South Dakota and Mexico, and further expansion is expected in the immediate future. Wherever greyhound racing has been introduced its popularity has spread by leaps and bounds.

## "BETTING INFORMATION

"Always call for the greyhound by its post position (large figure to the left of the dog's name).

"Ask for post position number of dogs first, then quantity of tickets desired, as: 'Number two, two tickets.'

"Please have exact change ready.

"To avoid last-minute congestion and the possibility of being shut out, purchase your mutuel tickets early.

"Be sure you are in the right line.

"Straight means to run first, to win the race. Your dog must win for you to win. Place means to run EITHER first or second. You win if your dog finishes either first or second. Show means to run EITHER first, second or third. You win if your choice finishes first, second or third.

"You hold a winning tickets when your dog does as well or better than you bet him.

"Mutilated tickets will not be honored.

"Please be sure you get correct ticket before leaving window, as we POSI-TIVELY cannot exchange tickets. No exception to this ruling will be allowed.

"All decisions are made by the judges and are final.

### "SUPERVISION

"For the protection of the bettor, all greyhounds must be placed in hold-out kennels which are under the supervision of the Racing Secretary at 6 p. m. on the evening of the race in which the greyhounds are to be run. The grey-hounds are not returned to their owners until after the race in which they are entered has been finished.

### "QUINIELA BETTING

"The Quiniela is a combination wager in which a player selects the num-bers of two dogs in a race and wins if both finish in the first two winning posi-tions.

"One of the dogs selected must win and the other finish second. It makes no difference which of the two is the winner so long as both finish either first or second.

"As an example, if a ticket is purchased for the 2-8 combination and the No. 8 dog wins while the No. 2 dog comes in second, the player wins. If either fails to finish as good as second there will be no return.

"Always call for lowest number of the Quiniela combination first. This facilitates purchases and helps to prevent error."

The dogs chased a "mechanical rabbit" which was propelled around the track by an electric motor or similar device. The premises were equipped with "betting windows" and a cashier's cage where bets were placed. A betting ticket cost two dollars, and a "customer" could place bets on any or all dogs and on any com-bination selected by him to "win, place or show." "Odds" on each dog were announced over a public address system and fluctuated up or down depending upon the amount of money wagered on or against a particular dog. The practical effect of this was that a person placing a bet was unable to determine in advance the amount he would win even though "his" dog won, placed or showed, in ac-cordance with the particular wager. Before the start of each race bets were "closed" and the odds were calculated by a pari-mutuel machine which is a mechanical device for recording and tabulating information regarding the number and amount of bets, and from

this information the betting odds on the dogs entered could be calculated and determined from time to time during the process of the betting.

From the record before us it appears that the races, and gambling operations in connection therewith, were carried out and conducted in a completely "professional" manner and atmosphere, and were on a par with similar enterprises in sister states where pari-mutuel betting on dog and horse races is legalized.

Considerable testimony was introduced by defendant on the subject of greyhound breeding in Kansas, the skill and time involved in the training of racing dogs, and it was contended the element of "chance" is negatived by the fact the holder of a winning ticket is determined entirely by the "skill" employed by the bettor in picking a winner, coupled with the skill, speed and endurance of the dog itself in being able to outrun its competitors.

Defendant further contended the operations in question did not constitute a lottery or the sale of lottery tickets, and that under the provisions of the *exception* contained in G. S. 1949, 21-1510, he was entitled to conduct such operations for not to exceed a two weeks' period during the year.

The statute in question reads:

"That any person who keeps any room, shed, tenement, booth or building, or any part thereof, or who occupies any place upon any public or private grounds within this state with any book, instrument or device for the purpose of recording or registering bets or wagers or selling pools, upon the result of any trial or contest of skill, speed or power of endurance of man or beast which is to be made or take place within or beyond the limits of this state, *except within the inclosure of a race track and upon races or trials of speed being conducted within said inclosure (provided that the exception herein shall not apply to any race track or inclosure for more than two weeks in any one year)*, or any person who records or registers bets or wages [wagers], or sells pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast, which is to be made or take place within or beyond this state, or upon the result of any political nomination, appointment or election which is to be made or held either within or beyond the limits of this state, or being the owner, lessee or occupant of any room, shed, tenement, tent, booth or building, or part thereof, knowingly permits the same to be used or occupied for any of the purposes hereinbefore prohibited, or therein keeps, exhibits or employs any device or apparatus for the purpose of registering such bets or wagers, or selling pools, as are hereinbefore prohibited, or becomes the custodian or depository for hire or privilege of any money, property or thing of value which is staked, wagered or pledged contrary to the provisions of this act, shall be guilty of a misdemeanor, and on conviction shall be punished by imprisonment in

the county jail for a period of one year and by a fine of one thousand dollars." (Our emphasis.)

The trial court adopted defendant's theory, denied an injunction for the remainder of a two-weeks' period, but enjoined the operations for the remainder of the calendar year.

From that portion of the ruling denying an injunction the state has appealed, and while the question involved has several facets, and has been variously stated, the precise question appears to be whether, under the facts of this case, the pari-mutuel betting operations constitute a lottery and the sale of lottery tickets, in violation of the provisions of our Constitution, *supra*.

In support of their respective contentions the parties cite numerous decisions from other states which have constitutional prohibitions against lotteries similar to ours. It is frankly conceded that the decisions are not in harmony and cannot be reconciled. In some states pari-mutuel betting on horse or dog races has been held not to be a lottery—in other jurisdictions just the opposite result has been reached. Because of this contrariety of opinion on the subject we do not consider it feasible or necessary to set out or discuss the cases cited, but look to our own law which has a bearing on the question.

Our Constitution prohibits lotteries and the sale of lottery tickets. G. S. 1949, 21-1501 to 1505, inclusive, deal with lotteries and provide penalties for those convicted of violations. Authorities are agreed that the essential elements and ingredients of a lottery are (1) consideration, (2) prize, and (3) chance. (34 Am. Jur., Lotteries, § 3, p. 647; 54 C. J. S., Lotteries, § 2, p. 845.) Our statute, G. S. 1949, 21-1506, defines a lottery in the following language:

"The term 'lottery,' as used in this act, includes schemes for the distribution of money or property among persons who have given or agreed to give a valuable consideration for the chance, whether called a lottery, raffle, or gift enterprise, or by some other name."

It is conceded the specific question involved has never been decided by this court, but an examination of the mentioned statutes (G. S. 1949, 21-1501 to 1506, inclusive) makes clear the public policy of this state as expressed by the legislature over the years. In upholding and enforcing this clear public policy this court has many times denounced various forms of gambling and attempts to circumvent the plain mandate of the statutes. A few of our decisions which are deemed persuasive on the general subject matter

are: *The State ex rel. v. Mercantile Association,* 45 Kan. 351, 25 Pac. 984, 23 AS 727, 11 L. R. A. 430; *In re Smith, Petitioner,* 54 Kan. 702, 39 Pac. 707; *The State, ex rel., v. Fair Association,* 89 Kan. 238, 131 Pac. 626, AC 1914D 361; *State, ex rel., v. Fox Kansas Theatre Co.,* 144 Kan. 687, 62 P. 2d 929, 109 A. L. R. 698 ("bank night" theatre plan as being a lottery); and *State v. Brown,* 173 Kan. 166, 244 P. 2d 1190 ("punchboard" as being a series of lottery tickets).

Our statute defining a lottery, *supra,* states that the term includes "schemes" for the distribution of money or property among persons who have given, or agreed to give, a valuable consideration for the "chance," irrespective of the "name" given to the transaction. In other words, an undertaking whereby persons pay a *consideration* for the *chance* to receive *money* or *property* constitutes a *lottery.*

Applying this definition to the facts before us—what do we find? It is conceded the customer pays for his wager on a particular dog. Such payment constitutes the *consideration.* It is conceded that if his dog wins he receives money in return, the amount, of course, depending upon the size and type of his bet. This return constitutes the *prize.* What, then, is the *chance* involved? The answer is very simple. In the first place, there is no guarantee that a certain dog is going to win, and neither is there any guarantee that a bettor will always pick a winner. In placing a wager the bettor takes a "chance" that he is picking the right dog. In the second place, under the pari-mutuel system of betting every bettor takes a "chance" on the *amount* he will win, even though his dog finishes in the exact position he bet that he would, for the reason that under this system the exact "odds" on a particular dog to "win, place or show" cannot be determined until the betting is closed and information regarding the number and amount of bets is tabulated by the pari-mutuel machine, which, in the last analysis, is simply a device for calculating the odds.

Defendant's argument to the effect that the outcome of the race itself, and human knowledge, skill and experience, the condition and speed of the dog whose efforts, together with the efforts of persons charged with the breeding, training and handling of such animals, are the sole factors which determine the recipient and amount of the prize, and that no element of "chance" is thus involved, simply does not take into account the practical everyday realities of human instincts and life.

In our opinion the operations under consideration constitute a lottery and the sale of lottery tickets.

As previously stated, defendant contends that as his gambling operations are "within the inclosure of a race track and upon races or trials of speed being conducted within said inclosure" he is permitted to conduct them for not to exceed two weeks in any one year under the *exception* contained in G. S. 1949, 21-1510, *supra.*

Our answer to this contention is that insofar as the exception purports to legalize pari-mutuel betting, such as we have here, and which we hold to be a lottery, the legislature was without power to enact it and such exception is void as being in contravention of our constitutional prohibition of lotteries and the sale of lottery tickets.

In addition to matters heretofore discussed, the state contends the exception contained in G. S. 1949, 21-1510, is unconstitutional in that it violates Article 2, Section 17, of the Constitution because it does not have uniform operation throughout the state—that is, certain actions are declared to be legal "on one side of a fence" and illegal on the other. However, in view of our holding, and for the further reason that it does not appear the question was presented to the trial court, we express no opinion thereon and the point requires no further discussion.

Our conclusion is that the trial court erred in holding that the gambling operations in question did not constitute a lottery within the meaning of G. S. 1949, 21-1506, thus rendering them a violation of Article 15, Section 3, of our Constitution.

The judgment is therefore reversed and remanded to the trial court for further proceedings in conformity with this opinion.