No. 45,858

THE STATE OF KANSAS, ex rel. KENT FRIZZELL, Attorney General, *Appellant,* v. HIGHWOOD SERVICE, INC., *Appellee.*

(473 P. 2d 97)

Opinion filed July 17, 1970.

*Edward G. Collister, Jr.,* Assistant Attorney General, argued the cause, and *Kent Frizzell,* Attorney General, and *Lance W. Burr,* Assistant Attorney General, were with him on the brief for the appellant.

*James D. Waugh,* of Topeka, argued the cause, and *David A. Sorenson,* also of Topeka, was with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: Highwood Service, Inc., hereafter referred to as defendant or Highwood, is a Michigan corporation which owns and operates television station KTSB, which is located in Topeka and broadcasts on channel 27 (UHF). By a letter dated April 24, 1969, Highwood advised the Attorney General of Kansas that it intended

to and would, in the immediate future, initiate a program with the title "Dialing for Dollars."

Closely following receipt of this letter, the attorney general, acting on behalf of the state of Kansas, commenced this action alleging that the program as outlined by Highwood constituted a lottery, and seeking to enjoin Highwood from broadcasting or exhibiting the same. After a hearing the trial court found, in effect, that the scheme or operation proposed by Highwood was not a lottery within the meaning of K. S. A. 21-1501. Accordingly, judgment was entered for the defendant. The state has appealed.

Briefly stated, the plan proposed operates in this fashion: The white pages of telephone directories from this general area are cut into segments of twenty names each and then placed in a rotating cage. One of those slips is drawn at random when the program goes on the air. From the names on the slip so drawn, one name is selected and a phone call is placed to that person. The person called is asked what the code number is (which will be either "up" or "down" and a number from 1 to 10) and what amount is in the "jackpot." If he has been watching the program he should know the answers, but even though he knows them not, he may hazard a guess and should his responses be correct he still will have "hit the jackpot." Should he be so unfortunate as to venture wrong answers, the answerer nonetheless is rewarded with a consolation prize of $1.00. If the person called is not reached for any reason, a prize of $1.00 is sent to him.

This scheme, which Highwood admits is aimed at increasing the viewing audience to the enhancement of its advertising revenues, is viewed askance by the state as being a lottery in violation both of article 15, § 3 of the Kansas Constitution and of K. S. A. 21-1501. Highwood indignantly denies such an accusation, and thus the issue is joined.

Article 15, § 3 of the state constitution reads as follows:

"Lotteries and the sale of lottery tickets are forever prohibited."

So far as material herein, K. S. A. 21-1501 prohibits the making, establishment or promotion of any lottery, gift enterprise, policy or scheme in the nature of a lottery. A companion statute, K. S. A. 21-1506, defines lottery in this language.

"The term 'lottery,' as used in this act, includes schemes for the distribution of money or property among persons who have given or agreed to give a valu-

able consideration for the chance, whether called a lottery, raffle, or gift enterprise, or by some other name."

The court has held that the essential elements of a lottery are three: (1) Consideration, (2) prize, and (3) chance. (*State, ex rel., v. Bissing*, 178 Kan. 111, 283 P. 2d 418.) The defendant concedes, in the case now before us, that two of these elements, *i. e.*, prize and chance, are present in its Dialing for Dollars program, but it asserts that the element of consideration is lacking. Hence the field of disagreement between the state and the defendant is narrowed to the single issue of consideration.

With respect to this point, the trial court, in a well prepared memorandum opinion, sagely observed:

"The question then to the Court is whether any financial gain that would or could be derived by the defendant by having a greater viewing audience is the 'valuable consideration,' or by inducing the participant to view a certain television station, consideration, as the third element in a lottery, has been fulfilled.

"No doubt some financial benefit would inure to the defendant by having a larger viewing audience but is this the consideration contemplated by the statute? This Court thinks not.

"Without going into a lengthy discourse on the history of lotterys, a gratuitous distribution of money by lot or chance is not within the purview of our lottery statute where no valuable consideration is derived or exacted from the participant receiving a chance to win a prize."

We believe the trial court spoke well and truthfully. K. S. A. 21-1501 does not, itself, define the character or the quantum of the consideration needed to constitute a lottery. Neither does its companion statute, K. S. A. 21-1506, set forth what consideration is required to create a lottery other than that it must be a "valuable" consideration, flowing from the participants.

What does, and what does not, provide the consideration necessary to the operation of a lottery has been the subject of much judicial verbiage to which, at this time, we shall not add materially. It is sufficient here to observe that, in our opinion, the bounds of reason would be exceeded were we to say that the requirement of consideration has been fully met whenever a TV fan turns the dial of his machine to Dialing for Dollars and then relaxes in his easy chair awaiting the call which he hopes will bring him fortune.

Our view in this regard finds respectable support in *F. C. C. v. American Broadcasting Co.*, 347 U. S. 284, 98 L. Ed. 699 74 S. Ct. 593. This case involved the interpretation of § 1304 of the United States Criminal Code prohibiting the broadcasting of "any lottery,

gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance . . ."

The program under challenge bore the title "Stop the Music", a give-away program similar to Dialing for Dollars, except that home contestants were asked to identify the musical selection which had just been played. If a correct answer was received, a prize was awarded the fortunate participant; if not, a consolation prize of lessor worth would be his sole reward. In holding that this scheme did not offend the federal statute, the United States Supreme Court said:

". . . The courts have defined consideration in various ways, but so far as we are aware none has ever held that a contestant's listening at home to a radio or television program satisfies the consideration requirement. . . .

"We believe it would be stretching the statute to the breaking point to give it an interpretation that would make such programs a crime. . . ." (pp. 293, 294.)

We are aware, not only of the foreign authorities cited by the state in which give-away programs have been held to violate lottery laws, but also of our own decision in *State, ex rel., v. Fox Kansas Theatre Co.*, 144 Kan. 687, 62 P. 2d 929, where a "bank night" plan was held to constitute a lottery in violation of 21-1501. In each of the several cases, however, the offending scheme required an overt act of participation on the part of a contestant such as making a purchase, visiting the sponsor's place of business or the filling in and mailing of a coupon.

The *Fox* "bank night" case is representative. There, a contestant was required to register by placing a form containing his name and number in a registration register located near the theater entrance or exit and the winner was required to present himself within a reasonable time at the theater in order to claim his prize, *i. e.*, a sum of money on deposit with a bank. A contestant was not obligated, however, to buy a theater ticket in order to register nor was the winner required to be in the theater when the drawing was held.

In deciding that the "bank night" plan constituted a lottery within the prohibition of the statute, this court stated that:

". . . [T]he indirect benefit derived by the defendant under the 'bank night' plan in the way of increased gross receipts from paid admissions, as set out in paragraph 10 of the answer, [which conceded that the plan was designed to increase gross receipts from paid admissions on bank nights and other nights, and that it had had such effect] is sufficient consideration coming directly or

indirectly from those entitled to the chances generally to meet the requirements as to that necessary element in a policy or scheme of drawing in the nature of a lottery. . . ." (p. 700.)

We believe the "bank night" plan with which this court came to grips in *State, ex rel., v. Fox Kansas Theatre Co.,* supra, is distinguishable from the Dialing for Dollars program proposed by Highwood. Hence, our decision in that case is not controlling here.

At this point it may be pertinent to observe that K. S. A. 1969 Supp. 21-4302 (3), which forms a part of the new Criminal Code effective as of July 1, 1970, expressly provides that "listening to or watching radio and television programs; answering the telephone or making a telephone call and acts of like nature are not consideration" within the meaning of the statutes defining a lottery.

The state properly points out, however, that the present action is predicated not only on the statutory prohibition against lotteries found in K. S. A. 21-1501, but on the constitutional interdiction set out in article 15, § 3 of the constitution, as well. The state further asserts that the constitutional provision is self-executing, *i. e.,* effective without the need of ancillary legislation. (See Black's Law Dictionary, Fourth Edition, p. 1525, and cases cited therein.) With this appraisal we have no quarrel.

In *Higgins v. Cardinal Manufacturing Co.,* 188 Kan. 11, 360 P. 2d 456, this court said:

"It is a settled rule of constitutional construction that prohibitive and restrictive constitutional provisions are self-executing and may be enforced by the courts independent of any legislative action, unless it appears from the language of the provision that the enactment of legislation is contemplated as a requisite to give it effect. The foregoing principle has been recognized in *Woodworth v. Bowles,* 61 Kan. 569, 60 Pac. 331; and *State, ex rel., v. Mercantile Association,* 45 Kan. 351, 25 Pac. 984; see, also, *State, ex rel., v. Deck,* 106 Kan. 518, 188 Pac. 238; 16 C. J. S., Constitutional Law, § 49; and 11 Am. Jur., Constitutional Law, §§ 71 to 77." (p. 18.)

But while the constitutional ban against lotteries may be self-executing, it is not self-defining. That function is judicial in nature, devolving upon the courts. We have heretofore had occasion to lay down general guidelines for its exercise. In *Higgins v. Cardinal Manufacturing Co.,* supra, we observed that a constitution is not to be narrowly or technically construed but its language "should be held to mean what the words imply to the common understanding of men" (p. 18); that in ascertaining the meaning of constitutional provisions courts should consider what appears to have been the

intendment and understanding of the people at their adoption. (See, also, *State v. Sessions*, 84 Kan. 856, 115 Pac. 641.)

Our limited research has brought to light no lay or legal dictionary of an 1859 vintage, the year the Kansas Constitution was adopted by the Wyandotte Convention. However, in Abbott's Law Dictionary, published in 1879, (a not too distant era) we have found this definition of a lottery:

"A scheme for the distribution of prizes by chance, among buyers of the chances.

"Such schemes were formerly very common, were anthorized by law, and were even set on foot, in many instances, by the authorities, for raising revenue for public or benevolent purposes. In view of the ill effects of the element of gambling involved, they are now very generally made unlawful."

Foremost among the citations appended to the text, the author has placed the following:

"A lottery is a distribution of prizes by chance or lot, where a valuable consideration is given for the chance of drawing a prize. United States v. Olney, 1 Abb. U. S. 275." (1868.)

Relying on the Abbott text, we feel justified in assuming that the common conception of a lottery about or near the time of the adoption of article 15, § 3; was much the same as it was in 1895, when the legislature enacted K. S. A. 21-1506 requiring the consideration from lottery participants to be "valuable." Webster's Third New International Dictionary, unabridged, (1964) conveys much the same idea as it defines lottery:

"a scheme for the distribution of prizes by lot or chance; *esp.:* a scheme by which prizes are distributed to the winners among those persons who have paid for a chance to win them, usu. as determined by the numbers on tickets as drawn at random (as from a lottery wheel)."

To similar effect, see Oxford Illustrated Dictionary (1962) and The Random House Dictionary of the English Language, The Unabridged Edition (1967).

In short, we entertain the opinion that not only in 1859, when the constitution was adopted, and in 1895, when K. S. A. 21-1506 was enacted, but in recent years as well, the common understanding of a lottery entertained by men in general has been that a consideration of value must flow from those who participate. We gravely doubt that had the ordinary man in the streets in 1859 been able to envision the advent of television he would have characterized as a lottery the give-away program known as Dialing for Dollars. Nor, in our judgment, would he have felt, any more than

his great-grandson would feel today, that in viewing the program in his own home, and at his own leisure and comfort, he was paying a valuable consideration for his entertainment.

The conclusion we have reached makes it unnecessary for us to consider the question of federal preemption raised by the defendant.

The judgment of the court below is affirmed.