The Honorable Clyde D. Graeber State Representative, Forty-First District State Capitol, Room 115-S Topeka, Kansas 66612
Dear Representative Graeber:
You request our opinion regarding the lottery amendment, article 15, section 3c of the Kansas constitution. You state that as a result of the Kansas Supreme Court's recent decision in State, ex rel. Stephan v.Finney, Docket No. 69,616 (Jan. 27 1994), the legislative committee you chair will begin considering a number of casino gaming proposals. Essentially you seek guidance in defining the phrase "state-owned and operated," as it is used in the constitutional provision. Specifically your questions are:
 "1. Must the state of Kansas own the real estate upon which a casino operates?
 "2. Must the state of Kansas own the casino building or the gaming equipment?
 "3. May the state of Kansas contract with private entities to construct a casino and operate games of chance within the casino?
 "4. May the state of Kansas lease the casino premises to a private entity to operate games of chance therein?
 "5. Must the personnel employed at a casino be state employees?
 "6. May the state of Kansas issue licenses authorizing private entities to place and maintain privately-owned casino gaming equipment?
 "7. May the state of Kansas receive a set percentage of the income derived from casino gaming operations conducted by a private entity which has entered into a contract with the state to operate a casino, with the remainder of the income going to the private entity?
 "8. May the state of Kansas create by legislation a quasi-public corporation, rather than a commission or agency, which would regulate casino gaming in the state?"
In reviewing whether various arrangements for operation of video lottery machines would satisfy the constitutional requirement that the lottery be state-owned and operated, this office concluded that "[a]s long as the state owns the business and has ultimate and complete control of the operation, article 15, section 3c of the constitution does not require that the state actually own the building or equipment used in a lottery operation." Attorney General Opinion No. 92-1. We continue to hold this opinion and see no reason to distinguish between video lottery and other types of casino games in terms of the ownership issue. Therefore, we answer your first two questions negatively; the constitution does not require that the state own the real estate upon which a casino operates or the casino building or gaming equipment. It is the ownership of the lottery business itself which is important.
The remainder of your questions deal with degree of state control over the operation of a casino. As stated in Attorney General Opinion No. 92-1:
 "Clearly, the more control the state retains, the easier it will be to determine that the operation is state-owned and operated. On the other hand, the fewer hands-on roles the state takes, the closer it comes to being state-regulated rather than state-owned and operated."
You ask that we help draw the line between regulation and operation by answering your series of questions.
The Kansas constitution does not define the phrase "state-owned and operated." Neither has it been defined by the judiciary. We must therefor apply rules of constitutional construction to arrive at what we believe will be the court's interpretation of that phrase. The paramount rule of constitutional construction is that effect must be given to the intent of the framers and adopters of the provision in question. State,ex rel. v. Finney, supra at 45. There are several tools available to determine the intent of the framers of the constitution, including comparison of the language in question to language used in related provisions, and legislative history of the concurrent resolution that became the adopted provision.
 "The importance of understanding the intentions of the legislature in proposing the amendment cannot be understated. . . . Where the purpose of the framers of constitutional provisions is clearly expressed, it will be followed by the courts." Id. at 46.
We begin with a comparison of section 3c of article 15 to section 3b of that same article. Section 3b, authorizing parimutuel wagering on horse and dog racing, was considered and passed by the legislature at the same time as the lottery amendment. While the lottery amendment, section 3c, authorizes the legislature to "provide for a state-owned and operated lottery," the parimutuel provision states:
 "[T]he legislature may permit, regulate, license and tax . . . the operation or conduct, by bona fide non-profit organizations, of horse and dog racing and parimutuel wagering thereon. . . ." Kan. Const., art. 15, sec. 3b.
Clearly two different concepts were envisioned: The state would own and operate the lottery but would regulate, license and tax the private operation of parimutuel wagering. See also Kan. Const., art. 15, sec.3a. Thus, it would appear that "state-owned and operated" means something different than "state-regulated, licensed and taxed."
1985 senate concurrent resolution no. 1609 (SCR 1609) is the proposal that became article 15, section 3c of the constitution. While there is no recorded discussion of the phrase "state-owned and operated" in the minutes of the committees that worked SCR 1609, the house committee was provided extensive information regarding the mechanics of a state lottery organization, including the functions a state agency would perform. Minutes, House Committee on Federal and State Affairs, January 16, 1986. Included in that information were statements such as:
 "Unlike a state lottery, bingo and raffle games are privately conducted by charitable and fraternal organizations under state license. Any profits inure to the benefit of the sponsoring organization. It was never intended that the games produce significant revenue for the state." Minutes, supra, attachment A (emphasis in original);
 "The states have adopted a variety of administrative arrangements for running their lotteries. In Delaware, Michigan, and New York, lotteries are managed by single heads; in the other lottery states, boards or commissions are used. The usual arguments apply. Use of a single accountable person is argued to promote responsiveness and accountability and to make it possible for the relevant department head and governor to be held unambiguously accountable. Use of a board or commission is said to insulate the activity from politics and promote public confidence in lottery operation.
 "The question of whether to use a board or commission is partly isolated from the question of where to place the lottery agency administratively. Lottery agencies are in the tax-collecting agency in [some states], but independent agencies elsewhere." Id.;
 "Most state lotteries are operated in generally the same way with day-to-day administration resting with a Lottery Director. Major units within the organization include Security, Administration, and Marketing. . . . Lottery staffs can range in size from Iowa at 125 to California's with over 500." Minutes, supra, attachment B.
In discussing the need for enabling legislation should SCR 1609 be adopted, the department of revenue presented the following:
 "A lottery is a unique entity in state government, in that it is the only state agency with a mission identical to a private business-selling a product in a fashion which maximizes revenue.
. . . .
 "Specific issues and potential problem areas that will need to be examined are:
 "1. Location of the lottery operation. Although most states have a lottery commission to advise and govern lottery activities, they differ as to the lottery being a part of a state Department of Revenue or a separate state agency. Regardless of where it is located, it must have its own identity and be clearly responsible for its decisions, both from an efficiency and public relations standpoint.
 "2. The lottery must be provided with the authority to enter into contracts . . . with vendors. . . ." Id. (Emphasis added).
Overall, the information presented to the committee illustrates an understanding that a "state-owned and operated lottery" would be one run by a state agency, board or commission with authority to contract for specific services including the ability to contract with private businesses to promote and retail state established lottery games a commission on basis.
As originally adopted by the senate, SCR 1609 contained these provisions:
 "(b) The legislature shall provide for a state lottery commission and for its control and supervision of any state-owned and operated lottery established hereunder. The state lottery commission shall have three members, appointed by the governor subject to confirmation by the senate, for overlapping terms as the legislature may prescribe. Not more than two members shall be members of the same political party. The state lottery commission shall report to the governor and the legislature at such times and upon such matters as may be prescribed by the legislature.
 "(c) All moneys received by the state from the operation of the state-owned and operated lottery which are not required for the financing of the operation of such lottery shall be allocated among the taxing subdivisions of the state in the manner prescribed by the legislature and shall be used only for the reduction of general ad valorem property tax levies upon tangible property." Journal of the Senate, 664-665, April 12, 1985.
After receiving testimony and information regarding the importance of flexibility in locating the lottery operation (Minutes, House Committee on Federal and State Affairs, January 16, 1986, attachment B), and in dedicating the proceeds of the lottery operation (Minutes, House Committee on Federal and State Affairs, January 21, 1986), the house committee voted to amend the resolution by deleting the above-quoted provisions, and adopted the resolution as amended. Minutes, House Committee on Federal and State Affairs, January 23, 1986; Journal of the House, Report of Standing Committee 1356, January 24, 1986. SCR 1609 was eventually adopted by both houses and the electorate without subsections (b) and (c), thus alleviating a constitutional requirement that the state lottery be under the "control and supervision" of a specific state commission. There was never any recorded discussion, however, that the amendment was intended to allow a non-state entity to operate the lottery. Having retained the "state-owned and operated" language, in contrast to the "regulate, license and tax" language in the parimutuel provision, it is our opinion that the framers of the constitutional amendment intended that operation of the lottery be the responsibility of a state entity.
In determining the intent of the adopters of a constitutional provision, "its language should be held to mean what the words imply to the common understanding of men" at the time of adoption. State, ex rel.v. Highwood Services, Inc., 205 Kan. 821, 825 (1970). "When interpreting the constitution, each word must be given due force and appropriate meaning." Finney, supra, at 46. First, the use of the conjunctive "and" is significant; the lottery must be both state-owned and state-operated. Thus, just owning the lottery would not appear to satisfy the constitutional requirement. The word "operate," when used as a transitive verb, was generally defined in 1986 as follows:
 "1. To run or control the functioning of: operate a machine. 2. To conduct the affairs of; manage: operate a business. 3. To perform surgery upon. 4. To bring about or effect." The American Heritage Dictionary 871 (2d College Ed. 1985) (emphasis in original).
This definition is consistent with our conclusion in 1987 that "[t]he intent and understanding of both the legislature and the people seems to have been to have a government controlled lottery as a revenue raising measure." Attorney General Opinion No. 87-16. From this it appears that the intent of the adopters, as well as the framers, was for the state to own the lottery as well as to control or manage it directly.
Applying the foregoing discussion to your specific questions, our responses are as follows:
 3. The state of Kansas may contract with private entities to construct a casino, as can be done with any state-owned and operated facility. The state may also contract with private entities to operate specific games of chance within the casino if ownership and sufficient control and responsibility over the business as a whole remains with the state.
 4. The state may not lease the casino premises to a private entity to operate games of chance therein. Mere ownership of the premises is not enough; the state must own and operate the business.
 5. Not all personnel employed at a casino must be state employees. The state may contract with private entities to provide services. Private entities providing contracted services may use their own employees. We caution, however, that as a matter of public policy sensitive positions should be held by state employees subject to termination by the state and ethics provisions and/or background checks.
 6. The state of Kansas may license private entities to place and maintain privately-owned casino gaming equipment as long as the state retains ownership and control of, and responsibility for, the gaming operation. For example, the state would determine the types of games and gaming equipment to be made available for public use, the betting limits, the stakes, the odds, and essentially how the equipment will be used and patrolled.
 7. An arrangement whereby the state agrees to permit a private entity to operate a casino in exchange for a set percentage of the take comes very close to regulation with a tax. However, if the arrangement is contractual and involves the state's retention of ownership and control, the issue of compensation would appear to be best left to sound business discretion exercised in the best interests of the state.
 8. The state of Kansas may not hand over the operation of a casino to a "quasi-public" corporation, and must play a more intimate and active role than that of a regulator.
Very truly yours,
 ROBERT T. STEPHAN Attorney General of Kansas
 Julene L. Miller Deputy Attorney General
RTS:JLM:jm